**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Richard TURNER, Defendant-Appellant.***

**Nos. 73-2740, 73-2937, 73-2959, 73-3082, 73-3083, 73-3156, 73-3159, 73-3168, 73-3575, 74-1057, 74-1085, 74-1151, 74-1322, 74-1465.**

United States Court of Appeals, Ninth Circuit.

July 24, 1975.

Certiorari Denied Dec. 1, 1975. See 96 S.Ct. 426.

As amended Dec. 31, 1975.

* Consolidated with:

*U. S. v. Grimes, 73-2937; Lewis (Howard), 73-2959; Lewis (John Henry), 73-3082; Johnson (Henry Bernard), 73-3083; Hackett, 73-3156; Nice, 73-3159; Woodrow, 73-3168; Ethridge, 73-3575; Johnson (Sharon), 74-1057; Johnson (Ollie Lee), 74-1085; Roberts, 74-1151; Gibson, 74-1322; Sneed, 74-1465.*

Martha Goldin (argued), Saltzman & Goldin, Hollywood, Cal., for appellants Turner, Grimes, Howard Lewis, Woodrow, Ethridge, Sharon Johnson.

Michael Kenny and Jerry Newton, Asst. U. S. Attys. (argued), Los Angeles, Cal., for appellee in all cases.

Allan B. Streller, Los Angeles, Cal., for appellant Hall.

Laurie Harris, Deputy Federal Defender (argued), Los Angeles, Cal., for appellant John Henry Lewis.

Sull Lawrence, Beverly Hills, Cal., for appellant Henry Bernard Johnson.

Leslie A. Kast (argued), West Covina, Cal., for appellants Hackett, Ollie Lee Johnson.

Armen Hampar, Los Angeles, Cal., for appellants, Nice, Roberts, Gibson.

Robert S. Michaels (argued), Los Angeles, Cal., for appellant Sneed.

OPINION

Before MERRILL, KOELSCH and KILKENNY, Circuit Judges.

PER CURIAM:

Fourteen separate appeals have been consolidated for argument and disposition. They result from different jury trials and trials before the court without jury and are consolidated because they relate to the same alleged conspiracy or to substantive offenses committed pursuant to it or to facilitate its purposes, and for the further reason that all appellants assert a common grievance: that their convictions resulted from illegal telephone taps.[1]

The Government alleged that on a date unknown defendant Joseph Levi Ethridge had organized and put into operation a large scale heroin and cocaine distribution scheme centered in the Beverly Hills area of Los Angeles, California; that Ethridge would obtain large quantities of these drugs from another defendant[2] and transport them to one of five residences maintained by the conspirators where they were kept under the control and custody of defendants Sharon Johnson and Sandra Woodrow; that Sharon Johnson would receive inquiries respecting purchases and refer prospective purchasers to Sandra Woodrow or Dolores Goldin; that Woodrow, in turn, would co-ordinate and direct the actual dispersal of the drugs to the purchasers with the assistance of other alleged conspirators.

Many different assignments of error are presented and the opinion-writing duties they entail have been divided among the members of the panel.

1. Seven appellants were, following a consolidated jury trial, convicted of conspiracy to distribute and to possess with intent to distribute heroin and cocaine in violation of 21 U.S.C. § 846: Ethridge, Grimes, Hackett, Sharon Johnson, Howard Lewis, John Henry Lewis, and Woodrow. Each also was charged with and convicted of one or more of the substantive offenses of possession with intent to distribute, distribution, or use of telephone communications for the purpose of facilitating the objects of the conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 843(b). The appeal of an eighth defendant, also convicted, Goldin, has been dismissed on her petition.

Two appellants were tried separately before different juries and convicted as follows: Ollie Lee Johnson, conspiracy to distribute and to possess with intent to distribute, and use of a communication facility to facilitate distribution of controlled substances in violation of 21 U.S.C. §§ 843(b) and 846; Roberts, possession with intent to distribute and use of telephone communications in violation of 21 U.S.C. §§ 841(a)(1) and 843(b).

Four appellants were tried on stipulated facts by the court without jury and were convicted of illegal use of telephone communications in violation of 21 U.S.C. § 843(b): Nice, Henry Bernard Johnson, Gibson, Sneed.

One appellant was tried by the court without jury on stipulated facts and convicted of simple possession of heroin in violation of 21 U.S.C. § 844(a): Turner.

2. This defendant, Trinidad Corrales Edeza, was tried and convicted with the first group of appellants but failed to appear for sentencing and is presently a fugitive from justice.

MERRILL, Circuit Judge:

## I. *THE WIRE INTERCEPTIONS*

On January 16 and February 2, 1973, then Attorney General Richard G. Kleindienst, by memoranda to then Assistant Attorney General Henry E. Petersen, personally authorized applications to be made by any investigative or law enforcement officer of the United States to a federal judge for orders authorizing interceptions of wire communications for a 20-day period to and from, respectively, two telephone numbers located at an address in Los Angeles[3] and two telephone numbers located at another address in Los Angeles. Assistant Attorney General Petersen then notified Irving Prager, Assistant United States Attorney for the Central District of California and Special Attorney-In-Charge, Office for Drug Abuse and Law Enforcement, Los Angeles, that Prager was authorized to make such applications. The applications were made by Prager to Judge Lucas of the United States District Court for the Central District of California, and orders were entered by Judge Lucas granting the applications. On February 6, 1973, Attorney General Kleindienst authorized an application for the continuing interception for a 10-day period of communications to and from the two telephone numbers at the first Los Angeles address. The application was made by Mr. Prager and granted by order of Judge Lucas.

Tapes were made of intercepted conversations and were, during trial, played to court and jury. Transcripts of the conversations, concededly accurate, were also furnished to aid the jury in following the recorded conversations. The conversations established in this manner constituted a substantial part of the Government's case against the alleged conspirators. The legality of the wire taps and the admissibility of the tapes and use of the transcripts are challenged on various grounds. Motions to suppress were made by all defendants and were denied. This is assigned as error.

### A. *Compliance With Title III*

In several respects it is contended that in the orders authorizing the interceptions and in the proceedings leading to them there was a failure to meet the requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20.

#### 1. *Authorization by the Attorney General*

It is contended that each memorandum of authorization from Attorney General Kleindienst to Assistant Attorney General Petersen failed to meet the requirements of 18 U.S.C. § 2516(1), in that it does not expressly appear from the memoranda that the Attorney General, prior to authorizing the interception, had reviewed any facts relating to the advisability of establishing taps on any of the listed numbers. It appears from the memoranda and affidavits that the Assistant Attorney General had made a recommendation and that the Attorney General had, without any comment, given his approval. Appellants characterize this as a "rubber stamp" of the Assistant Attorney General's judgment. The district court declined appellants' request that the Attorney General be subpoenaed to testify or compelled to answer interrogatories concerning the extent of his review of facts and exercise of judgment in authorizing the applications.

■ Section 2516(1) does not expressly require such a review by the authorizing officer. It provides: "The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for * * * an order authorizing or approving the interception of wire or

3. A third telephone number, located at an address in Beverly Hills, California, was also covered by the first authorization, application and order, but was discontinued by its subscriber on the date the interception was to have begun.

oral communications * * *." 18 U.S.C. § 2516(1). Appellants contend, however, that the statute as construed in *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), and *United States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), contemplates that the Attorney General or specially designated Assistant Attorney General should himself review the facts asserted to justify the use of wire interception and to constitute probable cause, and on the basis of such review exercise his judgment that the tap should be sought; and that the written authorization should, on its face, reveal that such review had been made by the authorizing officer.

We do not so read those cases. The Court in *Giordano* held that Title III did not permit the Attorney General to delegate to any subordinate, other than a specially designated Assistant Attorney General, the power to authorize application for intercept orders. This prohibition of a delegation proper in other instances was intended by Congress to centralize "in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques" and to ensure that "[s]hould abuses occur, the lines of responsibility [will] lead to an identifiable person." 416 U.S. at 520, 94 S.Ct. at 1829, *quoting* S.Rep. No.1097, 90th Cong., 2d Sess. 96–97 (1968), U.S.Code Cong. & Admin.News, p. 2112. To these ends "[t]he mature judgment of a particular, responsible Department of Justice official is interposed as a critical precondition to any judicial order." 416 U.S. at 515–16, 94 S.Ct. at 1827.

Once a proper authorizing officer is properly identified, however, thereby fixing on him the responsibility for a particular authorization, the basis on which, or the method by which, he gave the authorization is not, in our judgment, subject to review for compliance with § 2516(1). Rather it is to be presumed that the officer has properly exercised the judgment called for by the statute when he affixes his signature to an order authorizing an application.

We conclude that the authorization from Attorney General Kleindienst to Assistant Attorney General Petersen met the requirements of law.

2. *The Applications for Judge's Orders*

Pursuant to the authorization of Attorney General Kleindienst and the notification by Assistant Attorney General Petersen, as we have noted, applications for judge's orders were made by Irving Prager. 18 U.S.C. § 2518(1) deals with the requisites of such applications. They must be in writing, upon oath or affirmation, and must state the applicant's authority. Prager's applications complied. The subsection then specifies six items of information that must be included in the applications:

(a) The identity of the officer applying and the officer authorizing. This was done.

(b) "[A] full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted * * *."

The applications in all respects complied. The first application was for an interception at a residence on Kinglet Drive. From affidavits in support of the application it appeared that several informants of proven reliability all had stated that "Billy" Ethridge was dealing in heroin and cocaine out of that residence. The method of operation, as described by informants, was that the buy-

er would leave money with Ethridge at the Kinglet Drive residence and then be instructed to pick up the narcotics at a second residence. Ethridge would then call the second residence and advise someone there as to what was to be given to the buyer. Statements of informants were corroborated by agents who had participated in controlled purchases of narcotics by the informants. Lending further support was proof that Ethridge had a prior criminal record for narcotics involvement.

The second application, for an interception at a residence on Blue Heights Drive, was accompanied by excerpts from the interception at Kinglet Drive. Analysis of the phone calls corroborated the fact that the Kinglet Drive residence was being used for transaction of narcotics business and that a new outlet for narcotics distribution had been established at Blue Heights Drive by Sandra Gayle Woodrow and Ethridge.

The third application sought to extend the original interception at Kinglet Drive by ten days. A new showing of probable cause was made, including excerpts from interceptions at the Kinglet and Blue Heights Drive addresses.

> (c) "[A] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous * * *."

In this respect the affidavits in support of the applications stated that Ethridge was suspicious of being followed by law-enforcement officers; that the Kinglet Drive and Blue Heights residences were located on single-lane roads in mountainous areas, making undetected visual observations extremely difficult; that informants were unwilling to testify against Ethridge for fear of retaliation; that Ethridge's unwillingness to deal with strangers precluded undercover infiltration of his organization; that while agents had knowledge of Ethridge's involvement, they had been unable, by resort to normal investigative procedures, to obtain evidence to convict him and the other members of his organization.

In our judgment these affidavits provided that necessary "factual basis," *see United States v. Kerrigan,* 514 F.2d 35, 38 (9th Cir. 1975), to indicate that the "practical and commonsense" standard, S.Rep.No.1097, *supra,* at 101, required under the statute was satisfied. *See United States v. Brick,* 502 F.2d 219, 224 (8th Cir. 1974); *United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1014–16 (1974); *United States v. Falcone,* 364 F.Supp. 877, 888–90 (D.N.J. 1973), *aff'd on this issue on opinion below,* 505 F.2d 478, 480 (3d Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975).

> (d) "[A] statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception shall not automatically terminate when the described type of conversation has first been obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter * * *."

Here the original applications specified 20 days, while the application for extension of the interception at Kinglet Drive specified an additional 10 days. The applications sufficiently established probable cause to believe that repeated communications concerning narcotics would occur.

> (e) "[A] full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application * * * and the action taken by the judge on each such application * * *."

In both the second application and the application for a 10-day extension of the tap at Kinglet Drive, such showing was made by Prager.

■ Appellants contend that under the language of this paragraph, by its reference to "the individual authorizing

* * * the application," the Attorney General himself or the specially designated Assistant Attorney General must give a "full and complete statement of the facts concerning all previous applications," and thus that a showing by Prager does not suffice. We cannot agree.

The requirement seeks to ensure that the judge receives a full and complete report with respect to previous interceptions and the extent of information obtained thereby so that he can decide whether there is need for the further interception sought and whether there is probable cause to believe that further interception would provide seizable evidence. It is revelation of information that this paragraph seeks, and not demonstrable exercise of authority. The latter was accomplished by the Attorney General's authorization of the second application and the application for the 10-day continuation. The authorizing officer is not the primary source of knowledge in this area. Whatever enlightenment he could give the court would be second-hand.

> (f) "[W]here the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results."

The application for a 10-day extension of the tap at Kinglet Drive contains such a showing.

We conclude that the applications by Prager met the requirements of § 2518(1).

3. *The Orders of the District Judge*

Section 2518(3) authorizes entry by the district judge, to whom application was made, of an order for interception. As a condition it requires that the judge make certain determinations: first, that there is probable cause for belief that certain offenses have been, are being, or are about to be committed, that particular communications concerning that offense will be obtained by the interception, and that the facilities to be subjected to interception are, among other things, being used in connection with the offenses; second that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed. The orders of the judge authorizing the interceptions made such required determinations. The application and supporting affidavits provided sufficient basis for the requisite findings.

Section 2518(4) requires each order authorizing interception to specify the identity of the person, if known, whose communications are to be intercepted, the nature and location of the facilities to be subjected to interception, the type of communication to be intercepted and the offense to which it relates, the identity of the authorized intercepting agency and the person authorizing the application, the period of time covered by the authorization order, and directives whether the interception must cease when the first communication of the described type has been intercepted. The orders of the judge made all such required specifications. They provided that the interception should continue "until the communications intercepted reveal the details of the importation, possession and distribution of heroin and cocaine by Joseph Levi Ethridge in violation of the above-described offenses * * *." The interceptions were to terminate when this objective was attained but in any event were to terminate 20 days from the dates of the first and second orders and 10 days from the date of the third extension order. In addition, the first two orders required the applying officer, Irving Prager, to provide Judge Lucas "with a report on the fifth, tenth, and fifteenth day following the date of this order showing what progress has been made toward achievement of the authorized objective and the need, if any, for continued interception"; the third order required such report on the fifth day following its date.

With reference to the conversations the agents were authorized to intercept, the first order entered by Judge Lucas authorized the agents to intercept "wire

communications of Joseph Levi Ethridge and others, many who are as yet unknown, concerning the above-described offenses * * *." Those offenses and communications were substantially specified by the following findings contained in the order:

> "There is probable cause to believe that Joseph Levi Ethridge and others, many of whom are as yet unknown, have committed and are committing offenses involving the importation, possession with intent to distribute and the distribution of heroin and cocaine in violation of 21 U.S.C. § 841(a), 952, 960 and conspiracy to commit the aforesaid offenses in violation of 21 U.S.C. § 846, 963 and the use of communications facilities to facilitate the commission of said offenses in violation of 21 U.S.C. § 843(b).
>
> * * * [T]hese wire communications will be between Joseph Levi Ethridge and his associated [sic] concerning:
>
> (1) the date, time, place and manner in which illegal narcotic drugs will be delivered to Joseph Levi Ethridge, and
>
> (2) the price Joseph Levi Ethridge is to pay for the illegal narcotic drugs and the date, time, place and manner of payment for said drugs. Also, these wire communications will be between Joseph Levi Ethridge and buyers concerning: (1) the date, time, place and manner in which illegal narcotic drugs will be delivered to buyers and (2) the price paid for the narcotic drugs, and the date, time, place and manner of payment for said drugs."

The second and third orders were substantially identical but named, in addition to Ethridge, Sandra Gayle Woodrow, "Jane Doe" Sharon, and Barbara Nice.

■ Appellants contend that, in describing the subject matter of and participants in the conversations to be intercepted, the orders lack the specificity essential under the statute and required by the Fourth Amendment. They assert: "It left to the judgment of each individual listener the selection of those conversations which were 'narcotics.' Each agent was directed to use his own discretion." Contending that this amounted to a general warrant, appellants refer to *Marcus v. Search Warrant,* 367 U.S. 717, 732, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961), where the Court stated:

> "The warrants gave the broadest discretion to the executing officers; they merely repeated the language of the statute and the complaints, specified no publications, and left to the individual judgment of each of the many police officers involved the selection of such magazines as in his view constituted 'obscene * * * publications.' * * * It is plain that in many instances, if not in all, each officer actually made *ad hoc* decisions on the spot and, gauged by the number of publications seized and the time spent in executing the warrants, each decision was made with little opportunity for reflection and deliberation."

Obscenity cases present problems peculiar to themselves. The issue in the usual case is not whether the defendant engaged in certain conduct, but whether the material involved was obscene. A warrant that authorized the searching officer to exercise his own discretion in seizing anything he happens to think offensive presents problems of generality that do not occur here. Here the authorization was to intercept conversations having to do with the narcotics business—the purchase and sale of heroin and cocaine. If this allowed leeway it was not because the listener could decide for himself whether certain conduct violated the law, but because (as we shall note in discussing minimization) it was not readily apparent that a conversation related to narcotics. In our judgment the order was sufficiently precise. Indeed it would appear to be as precise as it could have been made, considering that those who were likely to be parties to narcotics conversations were as yet unknown. Warrants to search for or seize tangible objects have been upheld against such challenge where the places to be searched and the things to be

seized are described as precisely as the circumstances permit. *E. g., Quigg v. Estelle,* 492 F.2d 343, 345–46 (9th Cir.), *cert. denied,* 419 U.S. 848, 95 S.Ct. 86, 42 L.Ed.2d 78 (1974); *United States v. Scharfman,* 448 F.2d 1352, 1354–55 (2d Cir. 1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972); *James v. United States,* 416 F.2d 467, 472–73 (5th Cir. 1969), *cert. denied,* 397 U.S. 907, 928, 90 S.Ct. 902, 903, 938, 25 L.Ed.2d 87, 108 (1970). These orders met that test.

Section 2518(5) provides limitations on the period of time to be covered by the interception. The orders here did not exceed the times specified. This subsection also provides:

> "Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days."

The orders here contained such provisions.

We conclude that the orders of the judge authorizing the interception complied with the provisions of Title III.

4. *Notice of Interception*

Section 2518(8)(d) and (9) provides that notice of the interception and of the application and order therefor shall be given by the issuing judge to persons concerned within specified periods after the issuance of the order or before contents of intercepted communications are to be received in evidence. Such notice was given here.

We conclude that in the applications and orders there was full compliance with Title III by the Attorney General, his authorized law-enforcement officers and the district judge.

5. *Privilege*

18 U.S.C. § 2517(4) provides:

> "No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character."

California law makes criminal the tapping of telegraph or telephone lines, Cal. Penal Code § 631 (West 1970), and eavesdropping upon or recording any confidential communications, *id.* § 632, without consent of all concerned parties. Appellants contend that by these prohibitions all confidential communications, interception of which is foreclosed, are rendered privileged within the meaning of § 2517(4).

We rejected this argument in *United States v. Kerrigan, supra,* 514 F.2d at 37 n. 1. The section's use of the language "otherwise privileged" to us means privileged other than by virtue of their character as private telephone conversations. Title III, in providing for judicially authorized telephone interceptions, contradicts any claim of privilege attaching generally to all conversations so intercepted. The legislative history of the section indicates the limited effect Congress envisioned for § 2517(4):

> "Traditionally, the interest of truth in the administration of justice has been subordinated in the law to the interest of preserving privileged communications where four relationships have been involved: physician-patient, lawyer-client, clergyman-confidant, and husband-wife. The scope and existence of these privileges varies from jurisdiction to jurisdiction. The proposed provision is intended to vary existing law only to the extent it provides that an otherwise privileged communication does not lose its privileged character because it is intercepted by a stranger."

S.Rep.No.1097, *supra,* at 100, U.S.Code Cong. & Admin.News 1968, p. 2189.

B. *Compliance With the Court's Orders*

Appellants contend that the manner in which the interception was carried out was in violation of the orders.

Specifically, it is contended that there was not compliance with that portion of the orders providing that they "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception * * *."

18 U.S.C. § 2518(10)(a) provides:

> "Any aggrieved person * * * may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that— * * * (iii) the interception was not made in conformity with the order of authorization or approval * * *."

The parties take extrême positions with respect to this language. Appellants contend that failure to minimize during the interceptions taken as a whole requires suppression of the entire product of interception. The Government contends that only those conversations in which there was failure to comply with the court's order are subject to suppression; that only the parties to such conversations and the persons on whose premises the tapped telephones were located have standing to move for suppression of such nonminimized conversations from use against them; that a person seeking suppression must allege with particularity the circumstances in which minimization was not observed in the interception of those conversations as to which that person has standing to object; and that all but two appellants—Ethridge and Woodrow—have not met their burden in this respect.

The view which we take of the proof adduced on minimization in the court below makes it unnecessary for us to resolve the complex questions of standing to challenge the introduction of intercepted conversations as evidence and of the range of conversations to which each appellant may refer in seeking to suppress, for lack of minimization, those conversations as to which standing exists. As set forth more fully below, we hold that the evidence adduced on minimization was sufficient to support the trial court's ruling that the minimization requirement was complied with as to any relevant group of conversations.

Minimization as a process is not subject to the rigid standards appropriate where the process is one of elimination. The statute does not require that *all* conversations unrelated to the criminal activity specified in the order be free from interception. Rather it requires that measures be adopted to reduce the extent of such interception to a practical minimum while allowing the legitimate aims of the Government to be pursued. *See, e. g., United States v. James, supra,* 494 F.2d at 1018–19; *United States v. Cox,* 462 F.2d 1293, 1300–01 (8th Cir. 1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); *cf. United States v. Tortorello,* 480 F.2d 764, 783–85 (2d Cir.) (New York State interceptions), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). In a case where it is clear that the minimization provision of the order was disregarded by the Government throughout the period covered by the order, a total suppression might well be appropriate. We assume, *arguendo,* that such should be the rule. Here, however, the district court found reasonable and good-faith effort on the part of the Government to comply with the orders authorizing the interceptions.

Appellants dispute this finding. They contend first that failure to minimize during the early period of the interception permitted the officers to obtain evidence from which continuation of the first interception, establishment of the second interception, and extension of the first interception were justified, and consequently that all the wiretap evidence must be suppressed because derived from information obtained in violation of the statute and the order. Their second contention is that the evidence on minimization fails to establish that minimization

was observed in the interceptions considered as a whole. They write in one of their briefs:

> "The Government listened to everything: conversations about moving problems; conversations about the baby teasing the dog; conversations about license tags on automobiles; conversations about disagreements with relatives. The 'minimization' consisted of listening to conversations to confirm or deny 'suspicions' and hunches. The agents' suspicions were such that they listened to virtually everything, from beginning to end. No conversation which apparently had no narcotic character at its inception was terminated promptly; no conversation which turned from what the Government thought was a narcotic conversation to something else was terminated. The agents simply had a field day listening in on the private lives of a group of people 24 hours a day for approximately 40 days."

The Government introduced evidence tending to show that efforts were made to minimize the interception of innocent conversations. The listening agents had been given instructions on the need for minimization. They were told not to listen to privileged or irrelevant conversations but to be alert for conversations involving particular persons or places suspected of narcotics involvement and to attempt to identify the parties to conversations. They were further told to use their common sense and judgment regarding termination of interception of calls as to which they were uncertain of narcotics connection.

A summary compiled from logs kept by the listening agents during the interceptions showed the following with respect to the interceptions on all tapped telephone numbers taken as a whole:

> "Of a total of 1,788 intercepted conversations, 539 of those conversations involved busy signals, wrong numbers, and misdialings. Of the remaining 1,259 conversations which were completed telephone calls, 670 of those conversations, or 54% of the total, were conversations which lasted less than one minute. Of the 589 conversations monitored which lasted longer than one minute, 185 of those conversations or approximately ⅓ of this total were minimized to the extent that the recorders were terminated or shut off during the conversation. Twenty-two percent of all nonterminated [sic; completed] conversations related to narcotics conversations."

Apart from minor variations, this summary fairly represents the percentages of conversations of different varieties and actions by the monitoring agents as revealed in the interception logs for each of the four telephone numbers actually tapped. It can be said to be lacking in detail and in analysis of the content of the intercepted conversations. However, the district court offered to entertain challenges to each conversation sought to be introduced as evidence on grounds that interception of such conversation should have been terminated by the listening officers. No rulings on any such challenges are assigned as error on this appeal. The question, then, is whether the testimony submitted and the figures compiled by the Government state a prima facie case of compliance with the minimization directive in the judge's order with respect to whatever group of intercepted conversations may be referred to by each appellant for that purpose. In our judgment they do.

The intercepting officers confronted a situation difficult in that the number of persons involved in the conspiracy and their identity were unknown and therefore that the identity of those likely to be using the telephones for narcotics business purposes was unknown; that those using the telephone for narcotics business were careful to avoid the use of terms connected with narcotics and talked in code; that it was impossible to ascertain the character of conversations ambiguous to a listener without first establishing a reliable pattern of the conversations and obtaining an understanding of basic elements of the code being used. This pattern has become fa-

miliar in the reports, *see, e. g., United States v. Capra,* 501 F.2d 267, 273–76 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); *United States v. Cirillo,* 499 F.2d 872, 878–80 & nn. 5, 6 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); and it has been recognized that the use of code and the status of close acquaintances as co-conspirators present listening officers with special problems. It was to be expected, then, that the extent of interception might be somewhat larger at the inception of the surveillance—before the code was understood—than in the surveillance taken as a whole.

In our judgment the record supports the finding of the district court that reasonable and good-faith efforts to comply with the minimization requirement were made. Suppression for failure to minimize was not then warranted.

It is also contended that the interceptions should have been limited to conversations to which Ethridge or one of the other individuals named in the second and extension orders was a party and consequently that all other interceptions must be suppressed. No contention is made that either order or the extension failed to name any person who the Government had probable cause to believe would be using the tapped telephone facilities to commit the offenses specified in the orders. The challenge must therefore be rejected. *United States v. Kahn,* 415 U.S. 143, 155–58, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

Appellants further contend that it was improper to continue the interceptions beyond January 22, 1973, since Ethridge was incarcerated on a prior, unrelated narcotics charge from January 23, 1973, until after February 21, 1973. The "purpose" of the first order was then accomplished, we are told, because Ethridge was no longer able to conduct his activities in person. We cannot agree. The first order contemplated revelation of the details of the operation of Ethridge's organization. After Ethridge's incarceration it became evident that other members of the organization were carrying on business as usual. This fact was brought to Judge Lucas's attention together with the fact of Ethridge's incarceration in the second five-day progress report required under the order. Judge Lucas did not disapprove the continuance of the interceptions. Such ongoing supervision by the issuing judge is entitled to weight in determining whether the continued interceptions were proper.

We conclude that there was compliance with the judge's order as to the manner in which the interception was to be carried out.

C. *Constitutionality of Title III*

1. *"On its Face"*

Appellants argue that even though the interceptions and orders be found to comply with the statute, Title III "on its face" permits an invasion of home and office by general warrant, contrary to the command of the Fourth Amendment and the penumbral right of privacy cast by several amendments.

Nine circuits have passed on the constitutionality of Title III. *See United States v. Sklaroff,* 506 F.2d 837, 840 (5th Cir.), *petition for cert. filed,* 43 U.S.L.W. 3540 (U.S.Mar.2, 1975) (No. 74–1249); *United States v. Ramsey,* 503 F.2d 524, 526–31 (7th Cir. 1974), *cert. denied,* 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975); *United States v. Martinez,* 498 F.2d 464, 467–68 (6th Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 639, 42 L.Ed.2d 654 (1974); *United States v. James, supra,* 494 F.2d at 1012–13; *United States v. Tortorello,* 480 F.2d 764, 771–75 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *United States v. Bobo,* 477 F.2d 974, 978–82 (4th Cir. 1973), *cert. denied sub nom., Gray v. United States,* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1975); *United States v. Whitaker,* 474 F.2d 1246 (3d Cir. 1973), *rev'g,* 343 F.Supp. 358 (E.D. Pa.1972), *cert. denied,* 412 U.S. 950, 953, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973); *United States v. Cafero,* 473 F.2d 489, 493–501 (3d Cir. 1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223

(1974); *United States v. Cox, supra,* 462 F.2d at 1302–04; *United States v. Cox,* 449 F.2d 679, 683–87 (10th Cir. 1971), *cert. denied,* 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972). All have held the statute constitutional under the Fourth Amendment. In many of these cases extended consideration has been given to *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1966), and to the safeguards there discussed and held to be essential under the Fourth Amendment. The courts have all concluded that once those specified safeguards are met, the requirements of the Fourth Amendment are also satisfied; that in enacting Title III Congress was aware of the decisions of the Supreme Court in this area and had complied with the standards there set forth.

We agree.

2. *As Applied to the Facts of This Case*

Appellants persist, however, in their contention that the interception here, in the extent to which it lacked specificity and minimization (and for the reasons set forth in our earlier quotation from one of their briefs), constituted the very sort of intrusion upon privacy that the founding fathers found so offensive in the general search. This, as we understand it, is to say that any long-continued and comprehensive interception to which no party to the conversations has consented, by virtue of its unavoidably intrusive character, must be held to be unreasonable under the Fourth Amendment despite reasonable and good-faith efforts to minimize interception of innocent conversations. Mr. Justice Douglas appears to support this view in his opinion dissenting in *Osborn v. United States,* 385 U.S. 323, 340, 353, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966).

As we have already discussed, however, our reading of *Katz* and *Berger,* as well as *Osborn,* convinces us that when the safeguards specified in Title III have been provided, interception under court order on probable cause meets the requirements of the Fourth Amendment. Congress was well aware of the extraordinarily offensive character of such intrusions. Not only did it attempt scrupulously to meet the constitutional standards suggested by the Supreme Court, but it attempted also to assure that no interception ever would be sought save where there was responsible judgment by a high executive officer prior to application for court order authorizing any wire interception that governmental need outweighed the values of personal privacy underlying the Fourth Amendment.

"General search," in the context of wire interception, is a concept not easy to grasp. The term in general use conjures up visions of wide-ranging searches without time limits, for unspecified items the very existence of which is unknown until they are discovered—searches wherever and whenever the searching officer chooses and for whatever he may think is worth seizing. *See, e. g., Stanford v. Texas,* 379 U.S. 476, 481–86, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *Marcus v. Search Warrant,* 367 U.S. 717, 724–29, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

However, if that which is seizable and the place where it is to be sought are specified by order of court or magistrate, the fact that search for it ranged at large throughout a house into areas where personal privacy is most in need of protection is not enough to render the search unlawful as "general" if it was reasonable to suppose that the object of the search could be found where it was sought. *E. g., Warden v. Hayden,* 387 U.S. 294, 299–300, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Nor is the search invalidated by the fact that in attempts to identify that which was specified as seizable many unseizable items were examined and rejected, including some that were highly private.

We would note further that much of the interception of private conversation which occurred in this case was the inevitable consequence of the decision of ap-

pellants to intermingle their private lives and their narcotics activities. This factor has been noted in a different context. *See Lewis v. United States,* 385 U.S. 206, 213, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) (Brennan, J., concurring).

We conclude that appellants' contentions that it was error not to suppress the fruits of the wire interceptions are without merit.

KILKENNY, Circuit Judge:

## II. *THE CONSPIRACY*

### A. *Sufficiency of the Evidence*

Appellants Ethridge, Grimes, Hackett, Ollie Lee Johnson, Sharon Johnson, Howard Lewis, John Henry Lewis and Woodrow challenge the sufficiency of the evidence and charge that the government failed to establish that they conspired to possess and distribute heroin and cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846.

In as much as a detailed recital of the evidence against the co-conspirators would cover countless pages of printed material and would add nothing to our ultimate conclusions, we only touch on the factual highlights in the following summary.

The direct evidence of the unindicted co-conspirator, the witness Robert D'Amore, is sufficient in itself to convict appellants Ethridge, Sharon Johnson, Woodrow and John Henry Lewis. D'Amore's testimony clearly pinpoints Ethridge as the ringleader of the gang. He met Ethridge, whom he knew as Billy, at the former's residence on Angelo Drive, and during the next several months following the initial meeting they met at the home on many occasions. Shortly after one conversation, Ethridge gave the witness a sample of cocaine and soon thereafter accepted $500.00 on the purchase of other cocaine. Present on the occasion of this purchase was appellant Woodrow. On three separate occasions between April and November, 1972, the witness purchased one ounce of cocaine at a price of $1,000.00 per ounce. On some of these occasions, the witness would hand the money for the purchase to Woodrow, who was residing with Ethridge.

After November of 1972, his transactions with Ethridge took place on Kinglet Drive, and he then observed that Sharon Johnson was living with Ethridge. In December, 1972, when he ordered an ounce of cocaine from Ethridge, he was directed to go to an address on Olive Drive, Los Angeles, for the pick-up. In January, 1973, the witness telephoned the Ethridge residence on Kinglet Drive and spoke to Sharon Johnson, asking if it would be permissible for him to call Woodrow to take care of his business. Shortly thereafter, he called appellant Woodrow on the phone and was told by her to take the money for the purchase of an ounce of cocaine to Tower Records on Sunset Boulevard. Following this conversation, he met appellant John Henry Lewis—whom he knew as "Red"—and gave him $1050.00 for the purchase of an ounce of cocaine. Ethridge had supplied the witness with the telephone numbers. The witness identified John Henry Lewis in the courtroom. The following day, the witness received a telephone call from an unknown female who informed him that the cocaine he had ordered from Lewis was available at that time and secreted in a telephone booth. He subsequently picked up the package and made delivery to his own purchasers.

In their many conversations, Ethridge told the witness that the narcotics were coming from a person of Mexican ancestry.[4] He was instructed by Ethridge not to use the term drugs or anything like narcotics over the telephone, but should speak of "studio time, tape, and things like that." This witness also identified the voices of Sharon Johnson and Ethridge on the intercepted telephone conversations. The witness's testimony clearly establishes the conspiracy to distribute drugs among Ethridge, Sandra

4. Trinidad Edeza, a convicted co-conspirator, presently a fugitive from justice.

Woodrow, Sharon Johnson and John Henry Lewis.

That a conviction may be based on the uncorroborated testimony of an accomplice is settled law. *United States v. Daniel,* 459 F.2d 1029 (CA9 1972). This is the rule unless the testimony of the accomplice is incredible or unsubstantial on its face. *United States v. Andrews,* 455 F.2d 632 (CA9 1972). Here, the testimony of D'Amore is substantially corroborated by the independent evidence of the phone calls and the officers' testimony of police surveillance surrounding the witness' meeting with appellant John Henry Lewis at the Tower Records Store.

The evidence against the remaining conspiracy defendants, in large measure, consists of the contents of certain intercepted telephone calls. To place a proper meaning on certain of the words and phrases used by appellants in these calls, it was necessary to introduce evidence as to how they were used by those engaged in the narcotics traffic.

Special Agent Taylor, a 15-year veteran of the Bureau of Narcotics and Dangerous Drugs who had worked in an undercover capacity between three and four hundred times and had purchased narcotics in an undercover capacity between two hundred and three hundred times, was called as an expert in this area. He testified as to the prices commonly charged for the purchase of heroin and cocaine in varying quantities, the different quantities in which the substances were knowingly sold, and the terms affixed to the particular quantities, such as a "spoon" or "bindle." He testified that the substance heroin was commonly referred to by persons engaged in the narcotics traffic in masculine terms, such as "boy," and that cocaine was commonly referred to in terms of the feminine gender, such as "girl." His testimony made it clear that in the drug traffic, the drugs were commonly diluted or cut and sold, and that it was the standard procedure to pay for the drugs in advance, or to "front the money."

Although she is no longer a party to this appeal, we hold that there is ample evidence in the record to establish Golden's participation as a co-conspirator. Her involvement is established by five separate taped telephone conversations played during the course of the trial. They clearly establish that Sharon Johnson was deeply involved in the drug traffic with her co-conspirator Golden.

Essentially the same can be said of appellant Grimes. His telephone conversations with the co-conspirator Woodrow demonstrate, beyond doubt, his participation in the drug traffic supervised by Ethridge. The contention that he was talking about show business, rather than drugs, was resolved against him by the jury.

The taped telephone conversations received in evidence unquestionably have established that appellant Hackett, aka "Mr. Olson," was a central figure in the conspiracy. At least three relevant telephone conversations tie him in with co-conspirators Sharon Johnson, Woodrow and Lewis, all related to the Ethridge-led traffic in drugs.

In addition to the surveillance evidence, Hackett is linked to the conspiracy by a number of taped telephone calls, in some of which he was referred to as the "hatchet man." Some of these calls were between Woodrow and Sharon Johnson, others between Hackett and Woodrow, the calls zeroing in on the telephone number and residence of another appellant, Barbara Nice. The evidence of the conspiracy against Hackett is adequate.

Sometime between February 14 and 19, 1973, appellant Ollie Lee Johnson arrived in Los Angeles for the specific purpose of purchasing narcotics from Ethridge. His intercepted conversations with co-conspirator Sharon Johnson, the conversation between Woodrow and John Henry Lewis referring to Ollie, his complaints to Woodrow about the quality of the drugs he had been receiving, all deeply involve him in the Ethridge conspiracy. In many of these conversations Ollie was complaining about giving ap-

pellant Lewis $8,000.00 for six of the "fellows." The evidence is more than sufficient to show the complicity of this appellant in the conspiracy. To further detail the evidence against him would add nothing to the validity of our conclusion.

The next figure who challenges the sufficiency of the evidence against him is Howard Lewis, aka "Tex." The evidence, principally wire intercepts, paints a distinct picture of appellant Lewis working in concert with co-conspirators Woodrow, Hackett and Grimes in the massive drug ring here under scrutiny. Although the conversations, in general, were about show business, it is obvious that the jury was more impressed by the use of the language "40 B.B. Kings" and "20 'Bobby Blue Bland on the white label'," "girls," "boys" and other shadowy references, than the occasional references to "shows," "40,000 people for each show," and similar statements.

B. *Questions of Law*

At the outset, we emphasized that a criminal conspiracy need not be proved by direct evidence and that a common scheme or plan may be inferred from circumstantial evidence. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Aside from the direct evidence of D'Amore, the agents' surveillance and the taped telephone conversations, the circumstantial evidence against the conspirators is strong. Time after time, we have said that circumstantial evidence is not inherently less probative than direct evidence. *United States v. Nelson,* 419 F.2d 1237, 1239 (CA9 1969); *United States v. Rux,* 412 F.2d 331 (CA9 1969). We have no power to disturb the jury's verdict where it could rationally conclude from the evidence presented and the inferences drawn therefrom that guilt was established beyond a reasonable doubt. *United States v. Irion,* 482 F.2d 1240 (CA9 1973), *cert. denied,* 414 U.S. 1026, 94 S.Ct. 454, 38 L.Ed.2d 318; *United States v. Nelson, supra.* Once a conspiracy is shown to exist, only slight evidence is required to connect a co-conspirator. *United States v. Westover,* 511 F.2d 1154 (CA9, 1975); *United States v. Nunez,* 483 F.2d 453, 460 (CA9 1973), *cert. denied,* 414 U.S. 1076, 94 S.Ct. 594, 38 L.Ed.2d 483; *United States v. Knight,* 416 F.2d 1181, 1184 (CA9 1969). *See also, United States v. Marrapese,* 486 F.2d 918, 921 (CA2 1973), *cert. denied,* 415 U.S. 994, 94 S.Ct. 1597, 39 L.Ed.2d 891 (1974). The testimony of D'Amore clearly establishes the existence of the conspiracy, and the other evidence further links the individual co-conspirators.

Our painstaking examination of the record leads us to the conclusion that there was a conspiracy to possess and distribute heroin and cocaine, narcotic drug controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and that appellants Ethridge, Woodrow, Sharon Johnson, John Henry Lewis, Golden, Grimes, Hackett, Ollie Lee Johnson and Howard Lewis were members of the conspiracy. Likewise, we conclude that the evidence before us is ample to sustain the conviction of each of the appellants on the charge of conspiracy.

Appellants say that they were deprived of a fair trial and due process rights when the court permitted the government to play tape recordings containing hearsay material without first establishing by independent evidence proof of the conspiracy charged. The trial judge has wide discretion in supervising the order of proof in a conspiracy case. Here, the witness D'Amore had connected a substantial number of appellants with the conspiracy before the challenged tapes were offered in evidence. The court received the evidence subject to the establishment of the conspiracy. In this type of case, the trial judge may (1) admit certain evidence, subject to a later motion by the prosecutor to apply the evidence to all or certain defendants, or (2) admit the evidence as to all defendants, subject to a motion to strike if not connected with all or certain defendants. Here, the trial judge followed the latter course. *United States v. Knight, supra,* at 1185; *United States*

v. *Martinez,* 481 F.2d 214 (CA5 1973), *cert. denied* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974), and *Parente v. United States,* 249 F.2d 752, 754 (CA9 1957), are in point.

### III. *OTHER ASSIGNMENTS OF ERROR*

#### A. *Voice Identification*

Appellants Ethridge, Grimes, Hackett, Sharon Johnson, Howard Lewis, John Henry Lewis and Woodrow claim that the in-court identification of their voices was an exceptionally slender reed on which to connect them to the conspiracy. In approaching this avenue of escape, appellants Ethridge, Woodrow, Sharon Johnson and John Henry Lewis completely by-pass the testimony of their co-conspirator, D'Amore, linking them as active participants in the Ethridge narcotics hierarchy.

On this issue we agree with the government that the voice identifications were established through the use of both circumstantial and direct evidence. Voice identification may be established by either form of evidence. *United States v. Turner,* 158 U.S.App.D.C. 197, 485 F.2d 976, 979 (1973); *Carbo v. United States,* 314 F.2d 718, 743 (CA9 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). For that matter, we have directly held that once a *prima facie* case of voice authorship is established, the identity of the particular speaker is an issue of fact and may be established by circumstantial evidence alone. *Espinoza v. United States,* 317 F.2d 275, 276–277 (CA9 1963).

Aside from the circumstantial evidence consisting of telephone numbers, telephone wire tap locations, street addresses, both given and surnames in telephone conversations, and the observed conduct of appellants in visiting the places of residence of known co-conspirators, the government introduced the testimony of narcotics agents who had worked the court-authorized intercepts and had talked with appellants. Based upon those conversations, they identified the voices on the tapes received in evidence as those of appellants. This type of voice identification is permissible when, as here, a basis on which to make a reasonably accurate identification is shown. *United States v. Turner, supra,* at 979. Our examination of the record persuades us that the voice identification witnesses, federal and state law enforcement officers,[5] each had a substantial basis on which to express an opinion of the authorship of the taped voices. The officers and agents had either talked to appellants on the telephone at the time of the taping, had worked on the intercepts at the time they were made, or had spoken many times to one or more of appellants. *United States v. James,* 494 F.2d 1007, 1024 (CADC 1974), is closely in point on this issue.

We find nothing in the record which in any way indicates that the in-court identifications were based on a pre-trial practice or procedure which was unnecessarily suggestive, as condemned in *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), a case on which appellants rely. Here, the tapes and their contents were familiar to the officers long prior to the arrests, and the compared conversations took place in person at the time of the arrests. Moreover, as further distinguished from *Kirby,* the compared conversations here were before the jury and the identifying officer was subject to a full and complete cross-examination. True enough, some of the agents worked on correcting and editing the 500 pages of taped conversation transcript, but those agents, as previously mentioned, had originally worked on the intercepts and were familiar with the voices on the tapes prior to the correction or editing. We find nothing which points to an improper in-court identification of the voices of appellants. Simply stated, the rule in *Kirby* is not applicable to these facts.

5. Agent Frantzman, Deputy Sheriff Sullivan, Agent Kenney, Officer Burley, Agent Coleman, Deputy Sheriff Melendrenz, Deputy Sheriff Moreno.

B. *Standing to Challenge the Seizure*

Introduced in evidence were quantities of heroin and cocaine alleged to have been possessed and distributed at various times by appellants Ethridge, Hackett, Sharon Johnson, John Henry Lewis and Sandra Woodrow. The contraband had been seized not from appellants, but from three unindicted co-conspirators. Appellants moved to suppress the contraband, which motion was denied by the district court on the ground that appellants lacked standing to challenge the legality of the seizure.

Two of appellants, Grimes and Howard Lewis, along with former appellant Golden, were not charged with possession and distribution of the contraband. Instead, they were charged with conspiracy to commit the substantive offense. *Alderman v. United States,* 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969), makes it clear that ". . . suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing." Grimes, Golden and Howard Lewis were charged merely as co-conspirators and thus had no standing to challenge a search directed at other co-conspirators.

Nor do appellants charged with substantive counts of possession and distribution of the contraband have standing to challenge the search and seizure under the rule set forth in our recent decision in *United States v. Boston,* 510 F.2d 35 (CA9 1974). We there held that when possession at the time of the search is not an essential element of the crime charged, there can be no "automatic standing" under *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). Further; if what *Boston* characterized as "actual" (as distinguished from "automatic") standing is to be established, each appellant "must then show that at the time of seizure he had a possessory interest in that which he seeks to suppress." 510 F.2d at 38. Here, when the contraband was seized linking these appellants to its possession and distribution, actual possession had passed to the unindicted co-conspirators. In each instance appellants could have had no reasonable expectation of privacy in the contraband since they no longer had in it a possessory interest. The district court did not err in concluding that none of the appellants had standing to challenge the seizure of the contraband.

Since they lacked standing, we need not examine the substance of appellants' claims regarding the seizure. Appellants' claims that the seized contraband had no relevancy because it had not been sufficiently connected with them is meritless. The direct evidence of D'Amore, the tapes and the circumstantial evidence connects each of the appellants with the contraband.

KOELSCH, Circuit Judge:

C. *The Convictions under the 21 U.S.C. § 843(b)*

Appellants Ethridge, Grimes, Hackett, Nice, Woodrow, Gibson, Roberts, Sneed, Henry Bernard Johnson, Ollie Lee Johnson, Sharon Johnson, Howard Lewis, and John Henry Lewis challenged their convictions for violation of 21 U.S.C. §§ 843(b), 846, and 841(a)(1), the knowing use of a communication facility in causing and facilitating the commission of a narcotics felony.[6] They contend

6. 21 U.S.C. § 843(b) provides:

"(b) It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication."

that (1) the indictments failed to state an offense under § 843(b) because that section does not proscribe the use of a telephone in *facilitating* a felonious conspiracy punishable under § 846; (2) the district court erroneously instructed the jury on the telephone counts, hence permitting appellants' convictions without proof of the requisite criminal intent; and (3) the evidence of each violation was insufficient to support a conviction thereof. As to each appellant, we reject all three contentions.

1. *The Sufficiency of the Indictments*

The violations of § 846 involved here are of course felonies within the meaning of § 843(b).[7] Nevertheless, appellants raise the novel contention that § 843(b) merely prohibits the use of a telephone in facilitating the commission of "*any act or acts* constituting a felony" (emphasis supplied) and hence only makes unlawful the facilitation of a substantive offense, not the facilitation of a conspiracy. We disagree.

In our view, it is evident that the commission of the elements[8] of the offense of felonious conspiracy is the commission of "any act or acts constituting a felony" within the meaning of § 843(b). The plain language of that section makes clear that Congress sought to punish the use of a telephone in facilitating the commission of "any act or acts constituting a felony *under any provision of this subchapter*" (emphasis supplied); there is no indication, and moreover it would contravene the plain language of the statute to conclude, that Congress sought to exclude felonious violations of § 846.[9] We think the statutory language is sufficiently clear to provide notice to potential violators that the knowing facilitation by telephone of a felonious conspiracy under § 846 is punishable under § 843(b).

2. *The Propriety of the District Court's Instructions to the Jury*

Nor do we agree with appellants that the district court's instructions on the telephone counts permitted the jury to convict them without finding the requisite intent, *i. e.,* without actually finding that they were knowing participants in a conspiracy, and that they knowingly and intentionally facilitated a conspiracy by the use of the telephone. Our review of the relevant instructions leaves us convinced that the district court, in clearly and repeatedly stressing that the telephone facilitation of the conspiracy must have been knowingly and intentionally accomplished and that the defendants must have acted willfully, sufficiently explicated the requirement of specific intent.

7. 21 U.S.C. § 802, which contains a series of definitions pertinent to the subchapter here involved, provides: "The term 'felony' means any Federal or State offense classified by applicable Federal or State law as a felony." The applicable federal law, 18 U.S.C. § 1, classifies as a felony "[a]ny offense punishable by . . . imprisonment for a term exceeding one year." In accordance with this statutory classification, a violation of § 841(a)(1), being punishable by a term of imprisonment in excess of one year, is a felony. *See* 21 U.S.C. § 841(b). The offense of conspiring to violate § 841(a)(1), which is punishable by up to the maximum punishment prescribed for a violation of § 841(a)(1) itself, is similarly a felony. *See* 21 U.S.C. § 846.

8. A conspiracy, of course, is a partnership in crime; the gist of the offense is the agreement or confederation of two or more persons to violate the law, as implemented by one or more overt acts. *See Pinkerton v. United States,* 328 U.S. 640, 644, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942); *United States v. Rabinowich,* 238 U.S. 78, 88, 35 S.Ct. 682, 59 L.Ed. 1211 (1915); *United States v. Thompson,* 493 F.2d 305, 310 (9th Cir. 1974).

9. Though we consider the statute clear on its face, we note that the legislative history of the Comprehensive Drug Abuse Prevention and Control Act, P.L. 91–513, fully comports with our conclusion. H.R.No.91–1444 (91st Cong.2d Sess.), 1970 U.S.Code Cong. and Admin.News p. 4566, states at 4616:

> "Section 403(b) [§ 843(b)] makes it unlawful for any person to knowingly or intentionally use any communication facility in committing or facilitating *the commission of a felony under this title or title III.*" (emphasis supplied)

3. *The Sufficiency of the Evidence*

We similarly reject the contention that the evidence of each distinct violation of § 843(b) was insufficient to support a conviction thereof. We have examined the lengthy record insofar as it pertains to the telephone counts and find in it evidence sufficient to permit the jury to find each appellant guilty beyond a reasonable doubt of the § 843(b) violation or violations of which he (or she) now stands convicted. The contents of the recorded telephone conversations themselves, when considered together and in the light of the voice identifications and the independent direct and circumstantial evidence establishing the existence of a conspiracy, make manifest the conclusion that the jury's inference of guilt beyond a reasonable doubt was permissible in the case of each conviction.

D. *The District Court's Restriction of the Testimony of Defense Witness Papcun*

At the trial of defendants Ethridge, Grimes, Hackett, Woodrow, Sharon Johnson, Howard Lewis, and John Henry Lewis, the government presented testimony aurally identifying certain voices contained in the recorded conversations as being those of defendants. The government established an appropriate foundation to the effect that each of the government witnesses giving such identification testimony was familiar with the voice of the relevant defendant and the recorded voice subsequently identified. This voice identification procedure fully comports with the general rule that testimony by a witness that he recognized the accused by his voice is admissible, provided only that the witness has some basis for comparison of the accused's voice with the voice which he identifies as the accused's. *See Espinoza v. United States,* 317 F.2d 275, 276–277 (9th Cir. 1963); *see generally* Annotation, *Identification of Accused by his Voice,* 70 A.L.R.2d 995.

After the government had presented sufficient testimony to make out a prima facie case of authorship of each of the relevant conversations, the defense offered the testimony of witness Papcun to impeach the government's voice identifications. The district court permitted Papcun to give some testimony as an expert but refused to permit him to compare the relative worth of the aural identification procedure employed by the government with other methods.

The general test for the admissibility of expert testimony is whether the jury can derive "appreciable help" from such testimony. That determination, which necessitates balancing the probative value of the tendered testimony against its potential prejudicial effect, is committed to the broad discretion of the district court; it will not be disturbed on appeal unless manifestly erroneous. *See United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir. 1973).

Here, the district court was well within its discretion in restricting the presentation of the proffered testimony in the manner it did. The substance of the excluded testimony was Papcun's allegedly expert opinion that voice identifications by computer analysis or spectrographic analysis (voiceprint) techniques are more reliable than the aural technique employed by the government. Since the aural technique has long been an accepted method of voice identification in courts of law, we think the proffered testimony, which amounts to a backhanded attempt to discredit the government's identification witnesses and diminish the weight to be accorded their testimony, has little probative value. Under the circumstances, such testimony, if permitted, would have created a substantial risk of the witness' invading the province of the jury. *See United States v. Moia,* 251 F.2d 255, 257 (2d Cir. 1958).[10]

10. Our conclusion renders unnecessary our consideration of the question whether mechanical and/or spectrographic voice identification techniques are in accordance with a generally

E. *The District Court's Permitting the Jury to Use Transcripts as an Aid in Listening to the Recorded Conversations*

Appellants assign as error the ruling of the district court permitting the jury to use typewritten transcripts of the recorded telephone conversations during the playing of those recordings and to have them after the cause was submitted. We disagree.

There can be no doubt that the transcripts were an accurate rendition of the contents of the tapes. The district judge, in the presence of defense counsel, methodically reviewed many of the tapes and corresponding transcripts to ensure their conformity. In doing so, the court made appropriate corrections in the transcripts, including changes requested by defense counsel, and then found these transcripts accurate as corrected. Thereafter, upon the court's suggestion that the government and defense meet out of court and attempt to stipulate to the accuracy of the remaining transcripts, all counsel agreed that Mr. Reichmann, the attorney for defendant Howard Lewis, would conduct a comparison of the tapes and transcripts, making any necessary corrections. Reichmann did so, and subsequently all counsel stipulated that the corrected transcripts were an accurate rendition of the contents of the tapes, and further, that the court reporter need not transcribe the conversations as played but instead could simply copy the corrected transcripts into the record.

At trial, the jury members were permitted to use the transcripts as a "listening aid" in accordance with a carefully followed procedure. Before the playing of each of the taped conversations, each juror was given a copy of the appropriate corrected transcript. The transcripts were kept face down until the playing of the conversation had commenced and, at its conclusion, were immediately collected. In addition, the district court gave a cautionary instruction to the effect that only the recordings were evidence of the conversations; that the transcripts were provided merely to facilitate listening; and that each juror should, if he or she felt there was a difference between the two, "pay attention to [his or her] own senses and judgment as to what the recording does say."

Later, after the jury deliberations had begun, the jury requested by note that certain conversations be replayed, and several jurors asked in open court to use the transcripts during the replay. The court granted the request, following the same procedure as before, and again with the specific admonition that only the recordings, not the transcripts, were evidence of the conversations.

It is well recognized that accurate typewritten transcripts of sound recordings, used contemporaneously with the introduction of the recordings into evidence, are admissible to assist the jury in following the recordings while they are being played. *People v. Feld,* 305 N.Y. 322, 331–332, 113 N.E.2d 440 (1953). *See United States v. Murrapese,* 486 F.2d 918, 921 (2d Cir. 1973); *United States v. Bryant,* 480 F.2d 785, 790–791 (2d Cir. 1973); *United States v. Koska,* 443 F.2d 1167, 1169 (2d Cir. 1971), *cert. denied,* 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971); *Fountain v. United States,* 384 F.2d 624, 632 (5th Cir. 1967), *cert. denied,* 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); *United States v. Hall,* 342 F.2d 849, 853 (4th Cir. 1965), *cert. denied,* 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965). *Cf. Lindsey v. United States,* 332 F.2d 688, 691–692 (9th Cir. 1964); *Chavira Gonzales v. United States,* 314 F.2d 750, 752 (9th Cir. 1963). The admission of such transcripts as an aid in listening to tape recordings, like the use of photographs, drawings, maps, and mechanical models which assist understanding, *see Feld, supra,* 305 N.Y.

accepted explanatory theory. *See Amaral, supra,* at 1152–1154. *See generally* Annotation, *Admissibility and Weight of Voiceprint or Sound Spectrograph Evidence,* 49 A.L.R.3d 915.

at 331–332, 113 N.E.2d 440, is a matter committed to the sound discretion of the trial court. *Koska, supra,* 443 F.2d at 1169; *Fountain, supra,* 384 F.2d at 632; *Hall, supra,* 342 F.2d at 853.

We reject appellants' additional argument that the use of the transcripts unduly and prejudicially emphasized the contents of the conversations. It has been noted that the use of transcripts contemporaneously with the playing of sound recordings often eliminates the necessity of replaying the recordings many times, an alternative far more likely to emphasize their contents. *See, e. g., Fountain, supra,* at 632; *United States v. Lawson,* 347 F.Supp. 144, 148–149 (E.D.Pa.1972). Moreover, in *Lindsey v. United States, supra,* this court rejected the argument that the government's reading to the jury from a transcript of a recording, where the transcript was not in evidence but the recording itself was, gave the prosecution a "second shot" in proving the contents of the recording. We think the transcript procedure employed here was substantially less likely to unduly emphasize the contents of the recordings than the reading procedure employed in *Lindsey.*

Under the circumstances, the trial court was well within its discretion in permitting the jury to hear the tape recordings replayed after the deliberations had begun, *see Sears v. United States,* 343 F.2d 139, 144 (5th Cir. 1965), and in permitting the use of the transcripts in the way it did during the replaying of those tapes. In this context, we note that juries have been permitted to have copies of transcripts during deliberations in appropriate circumstances. *See Koska, supra,* 443 F.2d at 1169; *Chavira Gonzales, supra,* at 314 F.2d at 752.

## IV. *CONCLUSION*

Appellants' remaining contentions are without merit and are not of sufficient substance to warrant discussion.

The judgments of conviction are affirmed.