[No. 2218–3. Division Three. July 26, 1979.]

THE STATE OF WASHINGTON, *Respondent*, v. EDWARD LEON CUNNINGHAM, ET AL, *Appellants.*

*David H. Putney* (of *Halverson, Applegate & McDonald*), *Wiley G. Hurst* (of *Elofson, Vincent, Hurst, Crossland & Menke*), *Paul M. Larson* (of *Brooks & Larson*), *Russell J. Mazzola*, and *Smith & Scott*, for appellants (appointed counsel for appeal).

*Jeffrey C. Sullivan, Prosecuting Attorney*, and *Robert N. Hackett, Jr., Deputy*, for respondent.

ROE, J.—On September 19, 1976, 3-year-old David Weilbacher was found dead in the back bedroom of the Cunningham home in Yakima, Washington. Until his death, David lived with his mother Debbie Weilbacher, Leon Cunningham and his wife Velma, their daughter Carolyn Cunningham, and a family friend, Lorraine Ann Edwards. In April 1976, Leon, a self-ordained minister and head of the communal household, suspected that David was possessed by the devil. Relying on a biblical aphorism, "You may beat the child and he will not die,"[1] the household frequently included a spanking ritual in its daily religious services to rid David of his evil spirit. Wooden boards were sanded and then used to spank David as he was passed from person to person in the room. In addition, Leon and Debbie would "humble" David by repeatedly pushing him down on the floor. There was evidence that on the day he died, David was thrown to the floor. The exorcistic efforts apparently failed: David died on July 22, 1976,

---

[1]Proverbs 23:13 (New World Translation of the Holy Scriptures):

"Do not hold back discipline from the mere boy. In case you beat him with the rod, he will not die."

Verse 14:

"With the rod you yourself should beat him, that you may deliver his very soul from She'ol itself."

and he was placed in a back bedroom in the belief that God would resurrect him. Velma Cunningham went to the authorities 2 months later. A search warrant was obtained on the basis of her report; a search of the Cunningham residence revealed David's body.

Debbie Weilbacher, Leon, Velma, Carolyn Cunningham, and Lorraine Ann Edwards (hereinafter "defendants"), were arrested and charged with first–degree manslaughter and second–degree assault (by amended information). Following a lengthy trial, the jury found all defendants guilty of second–degree assault. Debbie, Leon, and Carolyn were convicted of first–degree manslaughter; Velma and Lorraine Edwards were convicted of second–degree manslaughter. Judgment and sentences were entered accordingly. Each defendant was sent to prison to serve consecutive terms.

A number of issues are raised on appeal,[2] which are discussed seriatim.

### COUNSEL

At the arraignment, defendants were fully and adequately informed of their right to appointed counsel. Each declined representation. At a subsequent hearing on bail, Velma Cunningham accepted Wiley G. Hurst as appointed counsel, but the other defendants insisted on conducting the defense pro sese. The trial court appointed a legal adviser from the Yakima County public defender's office to "stand by" in the event defendants reconsidered.

At the omnibus hearing, defendants informed the court that they wanted the legal adviser, Wade Gano, to represent the remaining four of them at trial. Voicing its concern over the prospect of joint representation, the court stated:

Now, you have this problem: I expect that it will not be possible for one lawyer to represent all of you, because I expect that there will arise a claim of a conflict of interest among the four of you. Now, that—Lori [Lorraine Edwards] is shaking her head. I'll give you the opportunity, I won't force four lawyers on you, but I will give you the opportunity to discuss that with Mr. Gano, who has

---

[2]Debbie Weilbacher withdrew her appeal on May 12, 1976.

indicated to me his willingness to serve. However, I see the possibility that a conflict may arise so that one attorney cannot represent all of you. That would be in a situation in which I could not force an attorney to compromise his obligation. Do you understand that? I will give you the opportunity to talk to Mr. Gano. I will appoint an attorney for you.

After consulting with Mr. Gano, defendants were adamant about joint representation. The following colloquy took place:

DEFENDANT CAROLYN CUNNINGHAM: We only agreed to take an attorney if we could have the same attorney represent all four of us, or we don't want one at all.

DEFENDANT LEON CUNNINGHAM: Or that we could have a part of the planning, I mean of the defense ourselves with the attorney. Or otherwise, I don't want a [sic] attorney at all.

THE COURT: Mr. Hurst?

MR. HURST: May it please the court, I have read these statements and I really, sincerely believe that there is a different defense for different people in here, and I think that at least each one of these persons should be advised individually, from reading the statements what those defenses are from an independent attorney. I don't know whether they want an attorney to do that or not, or whether they want to go into trial totally ignorant of the fact that they might have a legal defense, but from reading the statements there is a definite difference for at least three different individuals here.

THE COURT: Thank you.

MR. GANO: Your Honor?

THE COURT: Mr. Gano?

MR. GANO: After this weekend I also read the statements, and I have to concur with Mr. Hurst's assessment of the case. There is a defense for each one of these individuals and physical facts relating to it. Although they may have the same philosophy in connection with this matter, the physical facts dictate differing defenses.

THE COURT: What these attorneys have told us—Mr. Hurst representing Velma Cunningham, and Mr. Gano being the one that I appointed to advise you, if you requested advice—is that as attorneys they are able to see that you may have defenses against the State's

charges against you which an attorney would be able to present because he is able to recognize them, being schooled in the law; whereas, you, conducting your own defense, would not. It may be that the possibility exists, for example, that you be tried separately. Each of you will be sitting here alone facing the jury by yourself.

The obligation on the Prosecutor and the court continues to be as I told you before, that your trial be conducted within the standards of constitutional and moral fairness, and it will be. That does not mean that either the Prosecutor or the court can represent you. You must make a decision whether you wish to be represented, and if you do the court will see to it that you can be represented by competent counsel of the court's selection at public cost. You have that constitutional right. You have the constitutional right to represent yourself. To be not represented.

You can't have it both ways, and the burden that you put upon us by asking us to appoint one lawyer to represent all of you, or to dictate the method in which your defense will be presented, makes it impossible for us to anticipate that there will be an orderly trial. You put burdens upon us, because we are obligated to try you within a limited period of time; because if you change your minds later, it makes it necessary that counsel who might be appointed to represent you will need time to become acquainted with the case. It is possible it would even go so far as to require a mistrial, and to start over. The State is not required to do that for you. My advice to you remains the same as it was the first day you were here, that you should each have an attorney—

Ultimately, the four defendants chose to waive counsel. The court appointed a legal adviser for each one of them: the advisers were thereafter present at every stage of the proceedings, ably assisting the defendants both in and out of court within the limits of their advisorial capacity.

Defendants now contend that they were denied the effective assistance of counsel. They maintain that the decision to proceed pro sese was not voluntary, but "forced upon them by the trial judge who imposed improper conditions" on their right to counsel. For the following reasons, we

reject defendants' argument and find that no constitutional violation occurred.

■ The right to effective assistance of counsel is a fundamental one, guaranteed by the Sixth Amendment. *State v. Myers*, 86 Wn.2d 419, 545 P.2d 538 (1976). The State correctly argues, however, that the right is not absolute. Although the trial court has the primary duty to protect the accused's right to counsel, it has the correlative duty to ensure the justice that inheres in orderly judicial proceedings. A defendant does not have unbridled freedom to dictate the terms of his representation; an indigent is given no absolute right to a particular counsel. *Reiff v. United States*, 299 F.2d 366 (9th Cir. 1962). *See also* Annot., *Indigent Accused's Right to Choose Particular Counsel Appointed to Assist Him*, 66 A.L.R.3d 996 (1975), and cases discussed therein.

The choice of appointed counsel wisely rests with the trial court, as the accused is frequently ill equipped to appraise either the competence of an attorney or the merits of his case. Granting a defendant the absolute right to appointed counsel of his choice may promote disruptive and dilatory tactics. This case clearly illustrates these principles.

■ The court realized that the trial would be both lengthy and difficult. The complexities involved in joint representation would only have served to complicate and prolong the proceedings. Defendants, unschooled in the law, were oblivious to possible differing defenses amongst them. The trial court had no duty to accede to their request for a particular appointed attorney. The demand for joint representation exceeded the scope of the constitutional guaranty. *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), does not help defendants: that case merely decided that there is a constitutional right to proceed pro se.

There is an additional, and more important, reason why the defendants' argument must fail. Defendants do not challenge the competence of their legal advisers; rather,

they claim that their right to counsel was infringed because they were denied joint representation.

A criminal defendant is denied the effective assistance of counsel in violation of the Sixth Amendment when his attorney is required to represent a codefendant whose interests conflict. *State v. Alexis,* 21 Wn. App. 161, 584 P.2d 963 (1978). In the knowledge that the defendants had possible conflicting interests and differing defenses, the trial court could not constitutionally have allowed the joint representation. *Holloway v. Arkansas,* 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1978), supports this view. There, codefendants at trial made timely motions for appointment of separate counsel based on their attorney's advice that he risked representing conflicting interests. The trial court denied the motion and rejected counsel's claim that he could not adequately cross–examine the defendants if all of them decided to testify. The Supreme Court acknowledged that joint representation is *not a per se violation* of the Sixth Amendment. If, however, conflicting interests are involved, then requiring or permitting one attorney to represent codefendants denies them effective assistance of counsel. In such a case, joint representation offends the constitution, because

> the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process.

*Holloway v. Arkansas, supra* at 490.

Counsel may be precluded from challenging evidence favorable to one client but prejudicial to another, or presenting a closing argument that emphasizes the culpability of one defendant to the benefit of the other.

Of particular pertinence are the following remarks from Judge Lombard's concurring opinion in *United States v. Carrigan,* 543 F.2d 1053, 1058 (2d Cir. 1976):

> It would be a rare defendant who could intelligently decide whether his interests will be properly served by counsel who also represents another defendant. However

parallel his interests may seem to be with those of a co-defendant the course of events in the prosecution of the case, the taking of a guilty plea, or the conduct of the trial may radically change the situation so as to impair the ability of counsel to represent the defendant most effectively. Even defense counsel, who all too frequently are not adequately informed regarding the evidence available against their clients, may not be in a position to judge whether a conflict of interest between their clients may develop.

. . .

It follows that there will be cases where the court should require separate counsel to represent certain defendants despite the expressed wishes of such defendants. Indeed, failure of the trial court to require separate representation may, in cases such as this, require a new trial, even though the defendants have expressed a desire to continue with the same counsel. The right to effective representation by counsel whose loyalty is undivided is so paramount in the proper administration of criminal justice that it must in some cases take precedence over all other considerations, including the expressed preference of the defendants concerned and their attorney.

Both the prosecutor and the trial judge repeatedly and meticulously advised the defendants of their constitutional rights. When informed that their insistence on joint representation would be deemed a waiver of counsel, the defendants elected to conduct their own defense. We find, as did the trial court, that the defendants made a voluntary and intelligent waiver of the right to counsel and an intelligent and informed decision to proceed pro sese with the aid of legal advisers.

### Immunity to Tina

■ Concetta Marie Cunningham (Tina), the daughter-in-law of Leon and Velma Cunningham, lived with the defendants in Yakima from January 1976 to approximately June of that year. Pursuant to CrR 6.14,[3] Tina was given

---

[3]CrR 6.14 provides:

"In any case the court on motion of the prosecuting attorney, may order that a witness shall not be excused from giving testimony or producing any papers, documents or things, on the ground that his testimony may tend to incriminate or

prosecutorial immunity in exchange for her testimony concerning the defendants' participation in the spanking rituals. Although conceding that the State's practice of granting immunity is "related to the ends of criminal justice," the defendants contend that Tina's immunity order violated the Fourteenth Amendment and denied them "equal enforcement of the laws." Defendants' argument is foreclosed by *State v. Rhinehart,* 70 Wn.2d 649, 424 P.2d 906 (1967). Although that case involved selective enforcement of sodomy laws, and not immunity under CrR 6.14, we find the rationale controlling:

> [G]uilt or innocence cannot be made to depend on the question of whether other parties have or have not been prosecuted for similar acts. The failure of the state to prosecute others for the same or similar offenses is not a denial of due process or equal protection.

*State v. Rhinehart, supra* at 654. The prosecutor may elect whether or not to prosecute. *State v. Kanistanaux,* 68 Wn.2d 652, 414 P.2d 784 (1966).

The State's practice of granting immunity to one allegedly involved in a criminal act has been both hailed and assailed; however, it can be a necessary tactic of the prosecutor to elicit essential facts in aid of the truth. Better that some of the guilty are prosecuted than all go free. In *State v. Johnson,* 77 Wn.2d 423, 437, 462 P.2d 933 (1969), the Supreme Court summed up the grim practicalities:

> One of the sordid facts of life is that the most cogent proof of guilt frequently derives from an evil source. Criminals seem to know more about crimes than good people, and the state must get its evidence where it finds it.

There was no error in granting immunity to Tina Cunningham.

---

subject him to a penalty or forfeiture; but he shall not be prosecuted or subjected to criminal penalty or forfeiture for or on account of any transaction, matter, or fact concerning which he has been ordered to testify pursuant to this rule. He may nevertheless be prosecuted for failing to comply with the order to answer, or for perjury or the giving of false evidence."

UNSEQUESTERED JURY

The Cunningham trial was the subject of massive publicity. The intensity of the media coverage peaked after a jury was chosen and the trial began. The Yakima Herald Republic followed the case closely on a daily basis: detailed accounts of the trial, complete with pictures of the defendants, frequently appeared on the front page. Local and regional television stations[4] jockeyed for prime positions in the courtroom to facilitate live broadcasts of the trial proceedings. At the omnibus hearing, defendants first moved to sequester the jury. The prosecution joined with the defendants' later motion to sequester when, during trial, the local paper indicated its intent to publish a baby picture of David Weilbacher. Although denying these motions because there was no affirmative showing of prejudice, the trial court did poll the jurors individually to determine whether any had been exposed to publicity. One juror admitted having watched television, but not the news; another juror stated she had seen pictures on the front page of a paper in the courthouse newsstand. Both denied that they had been influenced or that the publicity would affect their verdict. The jury was allowed to separate until the case was submitted to it after the close of all the evidence.

Until 1973, RCW 10.49.110 governed the issue of jury sequestration, providing:

> Juries in criminal cases shall not be allowed to separate, except by consent of the defendant and the prosecuting attorney, but shall be kept together, without meat or drink, unless otherwise ordered by the court, to be furnished at the expense of the county.

Separation of the jury required consent of both parties. *State ex rel. Superior Court v. Sperry*, 79 Wn.2d 69, 483 P.2d 608 (1971). That statute was superseded by CrR 6.7 which deletes the consent requirement and posits responsibility on the trial court:

---

[4]Including KING–TV and KOMO–TV from Seattle.

The jury may be allowed to separate if the court finds that good reason exists to believe that such would not jeopardize a fair trial. Any motions or proceedings concerning the separation of the jury shall be made out of the presence of the jury. [Amended September 20, 1976.]

■ The rule does not incorporate any standards to guide the trial court in its decision. The same considerations weighed in ruling on a motion for change of venue provide ample guidelines for a trial court in determining whether sequestration of the jury is mandated in a particular case.

Common criteria or factors generally utilized by courts in determining the propriety of an order granting or denying a motion for change of venue based on alleged prejudicial pretrial publicity are: (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*State v. Crudup,* 11 Wn. App. 583, 587, 524 P.2d 479 (1974). When, as occurred in this case, publicity intensifies after trial begins, the effect of pretrial publicity on prospective jurors (Nos. 4 and 6 above) is not the major factor to be considered. Rather, the court should concentrate on the nature of the publicity, its scope in both quantity and geographical dissemination, and the sensational aspects of the case.

■ Relying on *State v. Pepoon,* 62 Wash. 635, 114 P. 449 (1911), the State argues that jurors are presumed to follow the court's instructions and admonitions, and that the presumption is defeated only by the defendant's proof of actual prejudice. This presumption has dubious validity

in notorious cases such as this. Keeping the jury together during trial serves not only to avoid the jury's *deliberate* violation of the court's instructions, but to guard against the risk that the jury will be *inadvertently* exposed to prejudicial publicity.

> When prejudicial publicity during trial is massive and so timed as to present a high probability that the jury will encounter it, a presumption arises that actual prejudice has occurred.

*State v. Trickel,* 16 Wn. App. 18, 29–30, 553 P.2d 139 (1976). We therefore reject the State's contention that the defendant must prove actual prejudice. Adopting the standard applied in cases concerning a motion for change of venue, we hold that when the circumstances involve a *probability of prejudice* to the defendant, the trial court should order sequestration. *State v. Stiltner,* 80 Wn.2d 47, 491 P.2d 1043 (1971); *State v. Bonner,* 21 Wn. App. 783, 587 P.2d 580 (1978).

It is unnecessary to decide whether the trial judge abused his discretion in allowing the jury to separate. The convictions must be reversed on other grounds and that error, if any, is unlikely to recur on retrial.

### DENIAL OF CONTINUANCES

■ The State filed the manslaughter charges on September 21, 1976, and the trial was scheduled to commence on November 8. On November 1, the State filed an amended information adding a charge of second–degree assault, alleging that all defendants

> did knowingly assault David Weilbacher, a human being, with an instrument or thing likely to produce bodily harm;

Defendants unsuccessfully moved to separate the two counts for trial, claiming surprise and inadequate preparation to defend the assault charge.

CrR 2.1(d) provides that:

> The court may permit any information to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced.

When the information is amended, the defense must prove specific prejudice, an essential element of reversible error. *State v. Aleshire,* 89 Wn.2d 67, 568 P.2d 799 (1977). Here, the charges were related: both were based upon allegations that defendants repeatedly abused David Weilbacher. The assault charge required no new evidence by the State; hence, it could not constitute surprise to the defendants. We do not find that defendants were prejudiced by the amendment of the information 1 week before trial or that the trial court abused its discretion in denying the motion for severance.

### PROSECUTORIAL MISCONDUCT IN OPENING STATEMENT AND CLOSING ARGUMENT

Defendants allege prosecutorial misconduct in the opening and closing remarks to the jury, such as labeling the spankings as strikings, whippings, beatings, etc.

■ Although we agree that argument, inflammatory remarks, and the injection of the prosecutor's personal opinion of the case have no place in the opening statement, *State v. Kroll,* 87 Wn.2d 829, 558 P.2d 173 (1976), we have reviewed the record and find no prejudicial error. The relevant inquiry is whether the remarks

> when viewed against the backdrop of all the evidence, so taint[ed] the entire proceedings that the accused did not have a fair trial?

*State v. Kraus,* 21 Wn. App. 388, 391, 584 P.2d 946 (1978), quoting from *State v. Nettleton,* 65 Wn.2d 878, 880, 400 P.2d 301 (1965).

It is unnecessary to discuss at length the various assignments of error concerning the State's closing argument. Although the defendants contend that both the closing and rebuttal arguments were replete with inflammatory and prejudicial remarks, only two objections were interposed.

> Unless the misconduct of counsel in his opening statement is so flagrant, persistent and ill–intentioned, or the wrong inflicted thereby so obvious, and the prejudice

resulting therefrom so marked and enduring, that corrective instructions or admonitions clearly could not neutralize their effect, any objection to such misconduct of counsel or error in the opening statement is waived by failure to make adequate timely objection and request for a corrective instruction or admonition. *Nelson v. Martinson,* 52 Wn.2d 684, 328 P.2d 703 (1958); *Jones v. Hogan,* 56 Wn.2d 23, 351 P.2d 153 (1960).

*State v. Morris,* 70 Wn.2d 27, 33, 422 P.2d 27 (1966).

The two objections raised by the defendants were overruled. Both the existence and the prejudicial effect of improper argument are matters most effectively assessed by the trial judge. His judgment will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Jefferson,* 11 Wn. App. 566, 524 P.2d 248 (1974). We find none.

## TAPED STATEMENTS

RCW 9.73.030(2)[5] prohibits recording a private conversation without the consent of all participants. RCW 9.73.050[6] generally renders any information acquired in violation of RCW 9.73.030 inadmissible.

RCW 9.73.090 creates an exception to 9.73.030, and provides in pertinent part:

---

[5]RCW 9.73.030(2) (since amended by Laws of 1977, 1st Ex. Sess., ch. 363, § 1):
"Except as otherwise provided in this chapter, it shall be unlawful for any individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions to intercept, record or divulge any:
" . . .
"(2) Private conversation, by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation."

[6]RCW 9.73.050:
"Any information obtained in violation of RCW 9.73.030 or pursuant to any order issued under the provisions of RCW 9.73.040 shall be inadmissible in any civil or criminal case in all courts of general or limited jurisdiction in this state, except with the permission of the person whose rights have been violated in an action brought for damages under the provisions of RCW 9.73.030 through 9.73-.080, or in a criminal action in which the defendant is charged with a crime, the commission of which would jeopardize national security."

The provisions of RCW 9.73.030 through 9.73.080 shall not apply to police and fire personnel in the following instances:

. . .

(2) Video and/or sound recordings may be made of arrested persons by police officers responsible for making arrests or holding persons in custody before their first appearance in court. Such video and/or sound recordings *shall conform strictly to the following*:

(a) the arrested person shall be informed that such recording is being made and the statement so informing him shall be included in the recording,

(b) *the recording shall commence with an indication of the time of the beginning thereof and terminate with an indication of the time thereof,*

(c) *at the commencement of the recording the arrested person shall be fully informed of his constitutional rights, and such statements informing him shall be included in the recording,*

(d) *the recordings* shall only be used for valid police or court activities.

(Italics ours.) A taped statement was taken from each defendant by Sergeant Langdale, a detective in the Yakima County sheriff's office. At trial, the tapes of Leon, Velma, and Carolyn Cunningham were played for the jury which was given transcripts prepared by the prosecutor's office as a listening aid. Although defendant Edwards' tape was not played at trial, Sergeant Langdale testified to its contents and his conversation with her.

Defendants repeatedly object to the admission of these tapes, arguing that the requirements of RCW 9.73.090(2) had not been met: (1) an indication of the starting time, RCW 9.73.090(2)(b), and (2) a full statement of constitutional rights, RCW 9.73.090(2)(c), were omitted from each tape. The trial court overruled the objections, finding in the first instance there had been "substantial compliance" and later "strict compliance" with the statute.[7]

---

[7]"THE COURT: The court's ruling is that the furnishing of the reference in the beginning of the tape to the *previously* signed constitutional rights is strict compliance with the statute, not because it is substantial compliance but, rather,

On appeal, defendants argue, and the State concedes, that these statements are "private conversations" within RCW 9.73.030. The State, however, contends that the defendants consented to the recording of their conversations with Sergeant Langdale, and as the statements were adjudged voluntary at a CrR 3.5 hearing, they were admissible at trial.[8] This argument is not well taken, as the statute requires more than consent.

██ ██ The term "private conversation" is not defined in RCW 9.73.030(2) and has not received a comprehensive interpretation in any published opinion.[9] Nevertheless, we agree that an interview between an accused and law enforcement personnel is a "private conversation" within the meaning of these statutes. *State v. Forrester*, 21 Wn. App. 855, 587 P.2d 179 (1978); *State v. Grant*, 9 Wn. App.

---

because the statute is designed to provide a means in the tape itself for a listener to determine that the person giving the statement has had an opportunity to consider the constitutional rights that apply to that situation and to take appropriate action. The facts in this case, while they do not indicate that the statement–taker conformed to the strict words of the statute, still did comply with the requirement of the statute that the person giving the statement have an opportunity to make a conscious decision about his constitutional rights. The time of starting and stopping is also supplied by the written evidence of the waiver of the constitutional rights. It is for that reason, and not for the reason that I ruled that it was substantial compliance, that *I admitted the tapes in the light of the statute.* The tapes, of course, were admitted for reasons other than the statute. The statute is a limiting statute, not an authorizing statute." (Italics ours.)

[8]Curiously, the prosecutor was permitted to ask of Sergeant Langdale in the presence of the jury, in reference to the tapes:
Now, is it not true that as to the voluntariness of these statements of these three girls and of Velma Cunningham and Edward Cunningham, these have been the subject of pretrial hearings, is that correct?
The sergeant answered yes. This evidence was admitted in open court as to voluntariness on a pretrial hearing which the jury had not heard. The implication is that the judge had already predetermined that the statements were voluntary, which could amount to a comment on the evidence. Even if a trial court makes a finding of voluntariness, a defendant is not precluded from disputing that issue before the jury. CrR 3.5(b) and (d).

[9]Sounds of gunfire, running, shouting, and screams of the victim recorded by him do not constitute "conversation" within the meaning of the statute. *State v. Smith*, 85 Wn.2d 840, 846, 540 P.2d 424 (1975).

260, 511 P.2d 1013 (1973).[10] Thus, the taped conversations here would fall within RCW 9.73.030 but for their exclusion by RCW 9.73.090(2). As an exception to RCW 9.73.030, RCW 9.73.090(2) must be strictly construed. *State v. Wanrow,* 88 Wn.2d 221, 559 P.2d 548 (1977), remains, at least, as authority for that proposition.

Unlike RCW 9.73.090(1), subdivision (2) does make provision for use of the recordings in judicial proceedings *provided* that the statutory requirements are satisfied. In ruling that the tapes were in compliance with the statute, the trial court ignored the plain language of RCW 9.73-.090(2): the words "shall conform strictly" do not seem to be ambiguous and we must assume that the legislature meant what it said. It is presumed that the legislature does not deliberately engage in unnecessary or meaningless acts. *Knowles v. Holly,* 82 Wn.2d 694, 513 P.2d 18 (1973).

> In RCW 9.73.090(2) the legislature has clearly expressed its policy determination that the use of recordings in the criminal process "shall conform strictly" to specified procedures for the protection of the privacy of the citizen and the defendant.

*State v. Wanrow, supra* at 231–32.

Although RCW 9.73.090(2)(b) requires that:

> the recording shall commence with an indication of the time of the beginning thereof . . .

the tapes of Leon, Velma, and Carolyn Cunningham did not contain a starting time. Sergeant Langdale began his taped conversation with Carolyn Cunningham with this statement:

> Carolyn, as I explained before, now that you've signed the waiver and had the explanation of all your warnings given to you, the conversation that we'll have from now on between you and I [*sic*] and the Prosecutor, Mr. Sullivan, will be on tape.

This fails to satisfy the command of RCW 9.73.090(2)(c) that

---

[10]*State v. Grant, supra,* excluded tape recordings made without defendant's knowledge.

at the commencement of the recording the arrested person shall be fully informed of his constitutional rights, *and such statements informing him shall be included in the recording.*

(Italics ours.)

In each instance, the defendants gave detailed accounts of their respective complicity in the spanking rituals and their actions on the final fatal day when David died. The probable impact of these tapes on the jury is obvious. We find that, as the tapes did not strictly conform to the specified statutory requirements, they were inadmissible.[11] We note, however, that a strict construction of the statute prohibits only the use of the tape itself or any other information obtained as a result of the tape.[12]

Although it appears that Velma Cunningham did not move to exclude her tape from evidence, she and Lorraine were prejudiced by their codefendants' taped statements which were improperly admitted.

## TRANSCRIPTS OF THE TAPES

Because parts of the defendants' taped statements were unclear and frequently inaudible, the prosecutor prepared transcripts to be used as a listening aid for the jury. Defendants, having compared the transcripts to the tapes, objected to many omissions and inaccuracies. A second set

---

[11]*State v. Wanrow, supra* at 229: "Employing the same logic here, the term 'private communication' in RCW 9.73.030(1) must have been used by the legislature in a sense which encompasses 'incoming telephone calls to police and fire stations.' (RCW 9.73.090(1).) *See State v. Grant,* 9 Wn. App. 260, 511 P.2d 1013 (1973). Thus, under RCW 9.73.030, the recording of respondent's conversation by the police without first obtaining her consent was unlawful and, under RCW 9.73-.050, is inadmissible in court *unless* it falls within an exception to these provisions [and complies therewith]."

*See also State v. Wanrow, supra* at 233.

[12]In *State v. Miner,* 22 Wn. App. 480, 591 P.2d 812 (1979), the person who taped a police call was permitted to testify to its content for impeachment purposes, even though RCW 9.73.030 (since modified) prevented the admission of the tape. There, as here, the tape was not used as a source for leads to other information or evidence to support the State's case in chief.

of transcripts was then prepared and used at trial. Defendants had not had an opportunity to scrutinize this latter set for accuracy and objected to its use by the jury. At trial, the court issued cautionary instructions to the jury that the transcripts were intended only to help them hear the tapes and were not evidence.[13] The transcripts, used only while the tapes were played, were then collected and did not go to the jury room during deliberations.

In order to understand how the transcripts came into this case, reference is made to the verbatim report. Preliminary to the introduction of the transcripts, Mr. Hackett, the prosecuting attorney, stated for the record:

It is the State's intention, based upon the prior entry of the order under 3.5 Hearing to present testimony, via recordings, of conversations with each of the defendants that were made early in the morning of September 20th. We propose, Your Honor, and have notified each of the defendants many, many days ago that at the time the jury is listening to these tapes, which will be broadcast through the PA system here in the courtroom, that they be allowed to follow their listening of these tapes with a transcript *prepared by my office* of each of the individual tapes. We do not propose, Your Honor, that the written transcripts be admitted into evidence for the jury's consideration.

. . .

. . . I should add that there are areas of the tapes that are difficult to understand because of reasons of speech. In one particular tape there is a defect in the recording of the tape, which is indicated on the transcript, for example. So, primarily, there is difficulty in listening to these tapes because of speech patterns, high voices–low voices, and so on, and it is just much easier, and the jury can give it its best attention to this very important matter if they are allowed to read, *and actually read what another*

---

[13]"THE COURT: Ladies and gentlemen, we are providing you with written transcripts of the tape you are about to hear, only for the purpose of helping you hear the tape and understand the words. They are not evidence, and the last time you will be able to use them will be at this proceeding."

*person has heard* from these tapes, and make their own determination of what is said and the manner in which it is said.

(Italics ours.) The prosecutor also indicated that the original transcripts had been corrected in accordance with the listening by the defendants along with a Mr. Dutcher of the prosecutor's office, and that those corrections had all been made and retyped and that those corrections made were agreed upon by Mr. Dutcher and the five defendants, or the four defendants, depending upon who listened to them. Although Mr. Hurst and his client Velma Cunningham agreed from the beginning that these transcripts would go in, Carolyn Cunningham stated:

On my part, I made no such agreement with Mr. Dutcher nor anyone else. We simply have not even heard the tapes completely through. We highlighted some spots in the manuscripts, but I had a statement, and I went through the statement concerning the other tape and that it's so far off it's not correct. There's too many insinuations, too many blanks, too many things left out, . . . today's the first time it was ever brought up that even the jury would even be considered giving [*sic*] a statement. In fact, I was told in the law book there's a best evidence rule, and the tapes are the best evidence.

In response to a question whether the other defendants listened to the tapes, defendant Edwards said, "No, not all the way through." Leon Cunningham said,

We only corrected a small amount of each statement. We didn't correct all the mistakes that they [*sic*] were by no means. Maybe 50 percent of the mistakes were corrected, and the statements, or there's a lot missing, a lot of— don't explain at all if it hadn't been corrected.

Debbie Weilbacher said,

I feel by giving the statements to the jury it will result in a *preparation* of our testimony, and I just don't feel that shouldn't [*sic*] be allowed.

(Italics ours.)

Mr. Hurst, counsel for Velma Cunningham:

> Your Honor, I would stipulate to Velma's transcript being given to the jury, and also that it could go into evidence if the Prosecutor so desires.

Mr. Hurst further said:

> [T]he only way I would stipulate is that if the Prosecutor did put it into evidence and that did go to the jury, . . .
>
> THE COURT: Very well, your offer is accepted, and the Prosecutor may do that *if he wishes.*

(Italics ours.) Referring to the tapes, the court stated to the defendants:

> Any means of improving upon that communication ought to be, and by this court, is allowed. . . .
>
> . . . If you find that there is an error, as you claim, *you may point that out to the jury,* you may make a record of it, you may make such corrections as you think are required. That does not necessarily mean that the State will agree with your corrections.

(Italics ours.)

Carolyn Cunningham wanted to know who retyped the statements. The court inquired if it was significant. She asked that it be known that the prosecutor's office had done it. She still objected to the written statements because there had been no foundation laid for several of the testimonies therein.

On appeal, defendants argue that the trial court erred in allowing the jury to view and read the transcripts, as no proper foundation was laid for these illustrative exhibits and their use at trial violated the best evidence rule. Citing *Bonicelli v. State,* 339 P.2d 1063 (Okla. Crim. App. 1959), they maintain that permitting the use of the transcripts was contrary to the rules against improper emphasis and hearsay.

May typed transcripts of taped conversations be admitted into evidence or used by the jury at trial? Courts have sharply divided on this issue even when the transcripts of the tapes were authenticated. In addition to *Bonicelli v. State, supra,* other cases have held that such transcripts are inadmissible under any recognizable theory. In *Duggan*

*v. State,* 189 So. 2d 890 (Fla. Dist. Ct. App. 1966), both the tapes and the transcripts were admitted into evidence over defendant's objection. The transcripts were given to the jury to read as the tapes were played and were sent to the jury room at the close of the case. On appeal, the court stressed the "highly prejudicial effect" of admitting the transcripts in evidence and reversed, stating:

> It is our opinion that the written transcripts of the three tape recordings were inadmissible in evidence under several established rules of evidence: permitting the transcripts to be furnished to the jury violated the best evidence rule, since the tape recordings themselves were the best evidence; the court reporter who made the transcripts was not present when the recordings were made, and hence his transcripts constituted pure hearsay and were inadmissible under the hearsay rule; and the jury's use of the transcripts violated the rules against undue repetition and improper emphasis.

*Duggan v. State, supra* at 891. In Washington, the issue is foreclosed by *United States v. Turner,* 528 F.2d 143 (9th Cir. 1975), *cert. denied,* 423 U.S. 996, 46 L. Ed. 2d 371, 96 S. Ct. 426 (1976), and *State v. Forrester,* 21 Wn. App. 855, 587 P.2d 179 (1978), *review denied,* 92 Wn.2d 1006 (1979).

In *Turner,* defendants were convicted of, *inter alia,* conspiracy to distribute narcotics in violation of 21 U.S.C. § 846 (1972). The consolidated appeals raised the common issues that the convictions resulted from illegal telephone taps and that the trial court erred in permitting the jury to use typewritten transcripts of the recorded telephone conversations. After determining that the wire interceptions were legal, because they met with all pertinent statutory requirements, the Ninth Circuit Court of Appeals addressed the issue of the transcripts.

In *Turner,* the trial judge and defense counsel reviewed both the tapes and transcripts to assure their conformity. Subsequently, all parties stipulated that the transcripts were "an accurate rendition of the contents of the tapes." As in the Cunningham trial, the jury was allowed to use the transcripts only while the tapes were played. They were

collected immediately afterwards and did not go to the jury room.[14] Rejecting the defendants' argument that the use of the transcripts unduly emphasized the taped conversations, the court found no material difference between the transcripts and other illustrative evidence.

> It is well recognized that accurate typewritten transcripts of sound recordings, used contemporaneously with the introduction of the recordings into evidence, are admissible to assist the jury in following the recordings while they are being played. . . . The admission of such transcripts as an aid in listening to tape recordings, like the use of photographs, drawings, maps, and mechanical models which assist understanding, . . . is a matter committed to the sound discretion of the trial court.

(Citations omitted.) *United States v. Turner, supra* at 167–68.

To the same effect is *State v. Forrester, supra*. Forrester, charged with aggravated first–degree murder and first–degree extortion, made a full confession after his arrest. The police taped his statement, and both the tape and transcript were admitted in evidence at trial. Forrester assigned error to the admission of the transcript, contending that it unduly emphasized his confession. This court rejected that argument and, after reviewing the *Bonicelli* and *Duggan* cases, held that

> [T]he admission of both tape and transcript is a matter within the sound discretion of the trial court, and that the trial court properly exercised its discretion in the instant case.

*State v. Forrester, supra* at 865.

Although *Turner* and *Forrester* rejected the rationale of *Bonicelli v. State, supra,* and established the general rule that transcripts may be admitted at trial or used as illustrative evidence, those cases are clearly distinguishable from the case at bench. In *Turner,* the trial judge reviewed the transcripts to determine their accuracy. Here, there is

---

[14]During deliberations, the jury requested and received a replay of the tapes, and several jurors again used the transcripts. *United States v. Turner, supra.*

no indication from the record that the trial court followed this procedure to ensure that the transcripts reflected the true contents of the tapes. Further, in both *Turner* and *Forrester*, all counsel had stipulated to the accuracy of the transcripts.[15] Defendants here protested the serious inaccuracy of the first transcripts, and apparently had no chance to preview the second ones which were used at trial. The pro se reactions are simple analyses of why the use of the transcripts was error. The court's suggestion that if there was error, the defendants could point that out to the jury, is not a substitution for authenticity or accuracy.

The following cases in which transcripts were admitted emphasize a need for accuracy and authentication: *United States v. Phillips,* 577 F.2d 495, 501 (9th Cir.), *cert denied,* 439 U.S. 831, 58 L. Ed. 2d 125, 99 S. Ct. 107 (1978):

> Phillips [defendant] now complains that these transcripts were inaccurate and hence not admissible. Phillips does not cite a single example of this purported inaccuracy, and the district court repeatedly reviewed the transcripts and found them to be accurate. . . . Testimony also was received from the FBI agent who prepared the transcripts verifying their accuracy. The transcripts were properly used.

citing *United States v. Turner, supra.*

In *United States v. Rinn,* 586 F.2d 113, 118 (9th Cir. 1978), the court cited *United States v. Turner, supra,* and stated:

> [T]he District Court permitted the jury to consider both the tape recordings and transcript only after a careful review of the tape recordings' intelligibility and the transcript's accuracy.

*United States v. Onori,* 535 F.2d 938, 948 (5th Cir. 1976):

> So the first efforts of the district court should be to devise a "stipulated" transcript, one to which all sides to

---

[15]"Here, the parties agreed that the transcript was an accurate copy of the tape recording, . . ." *State v. Forrester, supra* at 865.

"[S]ubsequently all counsel stipulated that the corrected transcripts were an accurate rendition of the contents of the tapes, . . ." *United States v. Turner, supra* at 167.

the dispute can agree. If one transcript is to be used, as an "aid" or as "evidence," there must be agreement about its accuracy, and a pretrial meeting in chambers may sometimes be necessary to determine if this is possible.

(Footnote omitted.)

*People v. Feld,* 305 N.Y. 322, 331, 113 N.E.2d 440, 444 (1953):

When the recordings were played back for the benefit of the trial jurors there was furnished to the court, counsel and each juror a mimeographed transcript of the recorded conversations . . . These had been made by an official stenographer who testified that they were made from the original recordings and were accurate "word for word". Before being admitted into evidence, the transcripts were compared by the court and the counsel not in the presence of the jury or members of the public.

*People v. Roldan,* 98 Misc. 2d 25, 413 N.Y.S.2d 97, 98–99 (1979):

Although there are no reported New York criminal cases involving the reading of a transcript contemporaneously with the viewing of a *videotape recording,* it is well established that where there has been proof of the accuracy of the typed manuscripts, they may be used on trial as an aid to understanding *tape recordings.* . . .

. . .

Absent proof of the accuracy or the reliability of the transcripts, they may not be used (*People v. O'Keefe,* 280 App. Div. 546, 115 N.Y.S.2d 740). However, where there is proof of their accuracy, they may be used as aids to the jury's understanding of the recordings (*People v. O'Keefe,* 281 App. Div. 409, 120 N.Y.S.2d 349, aff'd. 306 N.Y. 619, 116 N.E.2d 80, rearg. den. 306 N.Y. 744, 117 N.E.2d 918, cert. den. 347 U.S. 989, 74 S. Ct. 851, 98 L. Ed. 1123).

*State v. Dante,* 25 Ariz. App. 150, 541 P.2d 941, 946 (1975):

Participants in the conversations, Wagner and Bishop, and a Deputy County Attorney who monitored one of the conversations, vouched for the accuracy of the transcripts. We find that sufficient foundation was established to permit the use of the transcripts without

further establishing their accuracy through the testimony of the transcribers.

*State v. Tomlinson,* 121 Ariz. 313, 589 P.2d 1345, 1351 (Ct. App. 1978):

> It is well recognized that *accurate* typewritten transcripts of sound recordings, used contemporaneously with the admission of the recordings into evidence, are admissible to assist the jury in following the recordings while they are being played.

(italics ours), citing *United States v. Turner, supra,* and others. Before such transcripts are admissible, they must be authenticated either by stipulation or by proof of accuracy as the above cases mandate. Neither was done in this case; hence, it was error to submit the transcripts to the jury.

These reasons would be sufficient distinguishable differences. We find, however, a more marked difference between the above cases and this one. We previously determined that here the *tapes themselves* were inadmissible as the requirements of RCW 9.73.090(2) were not satisfied. In both *Turner* and *Forrester,* the tapes were held properly admitted into evidence.

Under RCW 9.73.050, "[a]ny information obtained in violation of RCW 9.73.030", if prejudicial, is inadmissible. Although the statute does not contain a list of what the term "any information" was designed to cover, it is certainly broad enough to include written copies of private conversations transcribed by one party to the interview. The transcripts additionally must fall with the tapes and, in these circumstances, *Turner* and *Forrester* are not controlling.

### EXPERT TESTIMONY

The defendants next maintain that the trial court committed several reversible errors concerning the testimony of the State's medical experts.

The State intended to call Drs. Muzzall and Brady as expert witnesses. Dr. Muzzall, the Yakima County Coroner, and Dr. Brady, the Oregon State Medical Examiner, both performed an autopsy on David's body and prepared a

report which was furnished to the defendants. Immediately prior to the expert testimony at trial, defendants moved for a continuance on the grounds of surprise, claiming that they had "just learned" that the proffered evidence would deviate from the information contained in the autopsy report. The "surprise testimony" would explore the medical possibility of a subdural hematoma as the cause of death in addition to the theory that David died from repeated beatings. In denying the motion for continuance, the trial court found that the defendants' continuous access to both witnesses for over a month defeated the claim of surprise. Defendants have failed to demonstrate that the trial court abused its discretion.

 Defendants next contend that the experts' opinion testimony on the ultimate fact of cause of death was without proper foundation and misleading to the jury. An expert may express an opinion on an ultimate fact in issue, provided that it aids the jury and does not mislead it to the prejudice of the opposing party. *Gerberg v. Crosby,* 52 Wn.2d 792, 329 P.2d 184 (1958); *State v. Upton,* 16 Wn. App. 195, 556 P.2d 239 (1976). The cause of death was difficult to determine from the autopsy due to the body's advanced decomposition. However, both doctors testified that David's medical and social history were significant factors in a diagnosis. Based on the uncontroverted evidence that David was consistently spanked over a period of several months, the experts concluded that the cause of death could probably be narrowed to either a subdural hematoma or repeated physical abuse. In view of the fact that the defendants' own expert, Dr. Beckwith, gave substantially similar testimony, it is unclear how defendants were prejudiced by the State's evidence. The opinion testimony had a factual basis in the record, and was therefore properly admissible under the rule of *Tokarz v. Ford Motor Co.,* 8 Wn. App. 645, 653, 508 P.2d 1370 (1973):

> If the expert's opinion assumes the existence of conditions or circumstances not of record, its validity dissolves and the answer must be stricken. . . . So long as the

answer is fairly based on material facts, supported by substantial evidence under the examiner's theory of the case, however, the opinion testimony is proper. The trial court has wide discretion to determine whether expert testimony falls within the above rules.

(Citation omitted.)

The trial court similarly has discretion to control and supervise the propounding of hypothetical questions. *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 381 P.2d 605 (1963). Defendants argue that a hypothetical question propounded by the State to Dr. Muzzall was improper as the supporting facts were drawn from the State's version of the case. If otherwise based on evidence of record, a hypothetical question is not rendered inadmissible because it favors the examiner's theory of the case. *Helman v. Sacred Heart Hosp., supra.*

We are convinced, from a review of the record, that the trial court was within its discretion in refusing to grant continuances which would only have served to protract an already lengthy trial. *State v. Sutherland,* 3 Wn. App. 20, 472 P.2d 584 (1970). We find no error.

INSUFFICIENCY OF EVIDENCE

Defendants make various assignments of error regarding the sufficiency of the evidence, only one of which warrants discussion. Velma Cunningham, Carolyn Cunningham, and Lorraine Ann Edwards contend that, as to them, the State failed to establish the corpus delicti of manslaughter.

The corpus delicti ("body of the crime") is proof that a crime has been committed. In homicide, the corpus delicti requires

(1) the. fact of death and (2) a causal connection between the death and a criminal agency, but the corpus delicti does not require proof of a causal relation between the death and the accused.

*State v. Lung,* 70 Wn.2d 365, 371, 423 P.2d 72 (1967).

An accused's confession has a limited role in establishing the corpus delicti. Standing alone, it is insufficient

evidence and the State is required to adduce proof independent of the confession to show that the crime occurred. If, however, independent proof is presented, then the defendant's statements may be considered "in connection therewith and the *corpus delicti* established by a combination of the independent proof and the confession.'" *State v. Lung, supra* at 372; *State v. Goranson,* 67 Wn.2d 456, 408 P.2d 7 (1965); *State v. Hamrick,* 19 Wn. App. 417, 576 P.2d 912 (1978).

There was no evidence that *any* particular defendant delivered the fatal blow to David, and the State did not proceed on that theory. Which of the Roman senators' daggers killed Caesar? The entire record has been carefully reviewed. We are convinced there was substantial evidence to show that David had been a normal, healthy infant; that his body was covered with bruises; and that according to the expert testimony, David would be alive had he not been subjected to physical abuse over the course of several months. The defendants' statements inculpating them *all* as participants in the spanking rituals served to corroborate the other evidence. Defendants' challenge to the sufficiency of the corpus delicti is therefore without merit.

### INTERROGATORIES TO THE JURY

The defendants next assign error to the trial court's denial of their motion to submit special interrogatories to the jury concerning the basis for a possible guilty verdict on the assault charge. A court's action in refusing to submit interrogatories to the jury is reviewable only for an abuse of discretion. *State v. Harold,* 45 Wn.2d 505, 275 P.2d 895 (1954). After reviewing the record, we hold that the denial of defendants' motion here was unreasonable and constituted an abuse of discretion. Had interrogatories been submitted as proposed by the defendants, the issue of double jeopardy, discussed below, would have been obviated. However, because of our disposition on the issue of double jeopardy, no further discussion at this point is necessary.

IMPROPER CHARGING UNDER NEW CRIMINAL CODE

Washington's new criminal code became effective July 1, 1976. David Weilbacher died 21 days later and the defendants were charged with first–degree manslaughter under the new code, RCW 9A.32.060(1)(a). RCW 9A.04.010(3) provides:

> (3) The provisions of this title do not apply to or govern the construction of and punishment for any offense committed prior to July 1, 1976, or to the construction and application of any defense to a prosecution for such an offense. Such an offense must be construed and punished according to the provisions of law existing at the time of the commission thereof in the same manner as if this title had not been enacted.

Defendants claim that they were improperly charged with manslaughter under the new code, as "the information and judgment and sentence were based on conduct occurring before the criminal code became effective."

We note at the outset that issues raised on appeal that are not supported by citation of authority will not ordinarily be considered unless well taken on their face. *Griffin v. Department of Social & Health Servs.*, 91 Wn.2d 616, 590 P.2d 816 (1979). Despite defendants' failure to supply corroborative support, the issue warrants discussion.

We reject defendants' contention that, as applied to them, RCW 9A.32.060(1)(a), the new manslaughter statute, is an ex post facto law.

An *ex post facto* law is

> ". . . 1st every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was when committed. 3d. Every law that changes the punishment, and inflicts greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the

offender." *Calder v. Bull,* 3 Dall. 386, 1 U.S. (L. Ed.) 648; 6 R.C.L. 276 [1798].

*State v. Lopeman,* 143 Wash. 99, 101, 254 P. 454 (1927).

Assuming arguendo that defendants' conduct on which the manslaughter convictions were based occurred *before* the enactment of the new criminal code, the ex post facto argument is still without merit. Manslaughter was clearly a crime *before* July 1, 1976,[16] and was, in fact, punished more severely than under the new code.

The general rule is that

> the information must state the facts constituting the offense in ordinary and concise language. The right of the accused to be apprised by the indictment or information, with reasonable certainty of the nature of the accusation against him to the end that he may prepare his defense and plead the judgment as a bar to any subsequent prosecution for the same offense, is zealously guarded in all our cases.

*State v. Jeske,* 87 Wn.2d 760, 765, 558 P.2d 162 (1976).

The informations in this case were sufficient under the *Jeske* standard to fully apprise defendants of the nature of the charges against them. Defendants' religious beliefs were the same before and after July 1, 1976. Their concept of discipline or exorcism did not vary. The amended manslaughter statute was not prejudicial to them. Although claiming that they were prejudiced, defendants do not claim that they were misled. This is a necessary prerequisite to dismiss an information. *State v. Long,* 19 Wn. App. 900, 578 P.2d 871 (1978).

Defendants have not urged that their *assault* convictions resulted from the application of an *ex post facto* law, and we therefore need not consider that possibility.

---

[16] "RCW 9.48.060 Manslaughter. In any case other than those specified in RCW 9.48.030, 9.48.040 and 9.48.050, homicide, not being excusable or justifiable, is manslaughter.

"Manslaughter is punishable by imprisonment in the state penitentiary for not more than twenty years, or by imprisonment in the county jail for not more than one year, or by a fine of not more than one thousand dollars, or by both fine and imprisonment."

Double Jeopardy

The information charged each defendant with one count of first–degree manslaughter for having recklessly caused the death of David Weilbacher "on or about July 22, 1976," and one count of second–degree assault. The latter count alleged that the defendants

> on or about *between May 1, 1976 and July 22, 1976,* did knowingly assault David Weilbacher, a human being, with an instrument or thing likely to produce bodily harm.

(Italics ours.) At various times, defendants strenuously urged that the court submit interrogatories to the jury along with appropriate instructions requiring the jury to make a finding as to the specific date of the alleged assault and/or the specific cause of death. The basis for this request was that the acts of spanking could constitute not only the cause of death but also an assault. Further, if the cause of death was not spanking, but rather the "humbling," since some defendants had not participated therein, they could be guilty of the assault but not manslaughter.

The court refused to submit the special interrogatories, and after the general verdicts on manslaughter and assault were returned, the court entered judgment on both. The defendants argue that the alleged assaults on the child were the basis for both counts in the information and the double convictions therefore violate the constitutional prohibition against double jeopardy.

██ ██ Both the United States Constitution[17] and the Washington State Constitution[18] provide that no person shall twice be put in jeopardy for the same offense. In addition to the ban on successive prosecutions, the double jeopardy provision forbids double punishment. *State v. Waldenburg,* 9 Wn. App. 529, 513 P.2d 577 (1973). Although an accused may constitutionally be *charged with*

---

[17]Fifth and Fourteenth Amendments.

[18]Article 1, section 9.

*and tried on* several offenses arising from the same criminal conduct, a conviction and sentence on each count in the information could violate the constitutional prohibition. *State v. Waldenburg, supra.* Washington early rejected the "same transaction" test of double jeopardy, which focuses on the defendant's behavior, and adopted the "same evidence test," which focuses on the offenses charged and the evidence necessary to support them. *State v. Roybal,* 82 Wn.2d 577, 512 P.2d 718 (1973). Under the extant test, the relevant inquiry is whether the offenses are substantially identical in law or fact,[19] *or if the lesser offense is a "constituent element in the perpetration of the greater offense.'"* (Italics ours.) *State v. Johnson,* 60 Wn.2d 21, 24, 371 P.2d 611 (1962). If the evidence required to support a conviction upon one charge would be sufficient to warrant a conviction upon the other, the offenses are substantially similar under the *Roybal* test, and the accused has been doubly punished for the same conduct.

The rule is that:

A lesser included offense exists when all of the elements of the lesser offense are necessary elements of the greater offense. Put another way, if it is possible to commit the greater offense without having committed the lesser offense, the latter is not an included crime.

*State v. Bishop,* 90 Wn.2d 185, 191, 580 P.2d 259 (1978), quoting *State v. Roybal, supra* at 583. The expert testimony at trial presented alternate theories on the cause of death. Under the theory that death ensued from repeated beatings, the assault was a lesser included offense of the manslaughter charge. It is unassailable that the State was required to prove, as a preliminary matter, that defendants beat David (assault) in order to prove that they beat him to death (manslaughter). In *State v. Bresolin,* 13 Wn. App.

---

[19]Although *State v. Roybal, supra* at 581, stated the standard to be whether the offenses are "'identical both in fact and in law'", this is subject to the qualification that the offenses need not be identical as entities or by legal name. *Huffman v. Smith,* 34 Wn.2d 914, 210 P.2d 805 (1949); *State v. Barton,* 5 Wn.2d 234, 105 P.2d 63 (1940).

386, 534 P.2d 1394 (1975), defendant was convicted of both second–degree assault and robbery arising from the same incident. In holding that this constituted double jeopardy, the court stated:

> One of the elements constituting robbery is the use of unlawful force or violence upon, or imparting fear of injury to the victim. *State v. McDonald,* 74 Wn.2d 141, 443 P.2d 651 (1968). We find the acts of force necessary to commit the robbery of Mark Medearis to be the same as the acts of force inflicted upon him as alleged in the count charging assault in the second degree. The litany of injuries inflicted upon the victim was part of a continuing, uninterrupted attack to secure "dope" or money, and constituted proof of an element included within the crime of robbery. Under the evidence in this case, the assaults inflicted were not separate and distinct from the force required for the robbery. . . . Where an act constituting a crime also constitutes an element of another crime, a defendant is placed in double jeopardy if he is charged with both crimes.

(Citation omitted.) *State v. Bresolin, supra* at 393–94.

Dr. Brady testified that David died from beatings to the body and head. This constituted an assault. There was no evidence that only one beating or any particular number of beatings caused death. We cannot speculate what the jury found. It may be that only the beatings of the last week caused death and the prior beatings would therefore be independent assaults, or that the cumulative beatings caused death. It may also be possible that the spankings did not cause death; the jury may have found that the prior "humbling" or the dropping of David on the last day of his life caused death. The jury was not given an opportunity to resolve this problem.

The alternate medical theory was that David died from a subdural hematoma, a cranial blood clot which can be caused by a sudden or repeated blows to the head. Under this theory, the assault as charged could again be a lesser included offense of manslaughter, for the court's

instructions[20] and the State's proof failed to confine evidence of the fatal assault on David to the manslaughter charge only. The basis of the verdict is forever consigned to the mysteries of the jury room deliberations: requested special interrogatories requiring the jury to make a specific finding on the cause of death and/or the date of the alleged assault were denied. It is therefore conceivable that evidence of the July 22, 1976, assault supported both the manslaughter *and* the assault convictions.

When a finding of guilty is made regarding both the greater and the lesser–included offense, the entry of judgment for the lesser offense must be vacated, as it is

---

[20]Instruction No. 5 read:

"To convict any of the defendants, EDWARD LEON CUNNINGHAM, VELMA CUNNINGHAM, CAROLYN KAY CUNNINGHAM, DEBRA MARIE WEILBACHER, or LORRAINE ANN EDWARDS, of the crime of Manslaughter in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt as to each of the defendants:

"(1) That between May 1, 1976 and July 22, 1976 the defendant recklessly caused the death of DAVID WEILBACHER;

"(2) That the defendant's acts occurred in Yakima County, Washington.

"If you find from the evidence that each of these elements has been proved beyond a reasonable doubt as to each of the defendants, then it will be your duty to return a verdict of guilty as to that defendant.

"On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to that defendant."

Instruction No. 12 read:

"To convict any of the defendants, EDWARD LEON CUNNINGHAM, VELMA CUNNINGHAM, CAROLYN KAY CUNNINGHAM, DEBRA MARIE WEILBACHER, or LORRAINE ANN EDWARDS, of the crime of Assault in the Second Degree, each of the following elements of the crime must be proved beyond a reasonable doubt as to each of the defendants:

"(1) That on or about between May 1, 1976 and July 22, 1976, the defendant knowingly assaulted DAVID WEILBACHER with an instrument or thing likely to produce bodily harm;

"(2) That the acts occurred in Yakima County, Washington.

"If you find from the evidence that each of these elements has been proved beyond a reasonable doubt as to each of the defendants, then it will be your duty to return a verdict of guilty as to that defendant.

"On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to that defendant."

deemed to have merged in the finding of guilty of the greater offense.

*State v. Rhodes,* 18 Wn. App. 191, 193, 567 P.2d 249 (1977); *State v. Waldenburg,* 9 Wn. App. 529, 513 P.2d 577 (1973).

Because in this case conviction and sentencing on both the manslaughter and assault charges occurred without clarifying interrogatories, such violated the constitutional prohibition against double jeopardy. The entry of judgment on the verdict for the assault must be and is vacated, as it cannot be said not to have merged in the finding of guilt of the greater offense of manslaughter. Ordinarily, the appropriate remedy is to set aside the conviction and sentence on the lesser offense, which would be the assault in this case. *State v. Hinz,* 22 Wn. App. 906, 912, 594 P.2d 1350 (1979). Due, however, to other error in the record, the entire case must be remanded for new trial.

## SENTENCING

Finally, defendants object to their sentences. Leon and Carolyn Cunningham were convicted of second–degree assault and first–degree manslaughter, both class B felonies carrying a 10–year maximum sentence.[21] Velma Cunningham and Lorraine Ann Edwards were convicted of second–degree assault and second–degree manslaughter, a class C felony with a 5–year maximum sentence.[22] Having decided not to defer sentencing or grant probation, the trial court imposed maximum consecutive sentences for each crime on all defendants, RCW 9.95.010.

 RCW 9.92.080 empowers the trial court to impose consecutive sentences.[23] Although a sentence may be

---

[21]RCW 9A.20.020(b).

[22]RCW 9A.20.020(c).

[23]RCW 9.92.080:

"Sentence on two or more convictions or counts. From and after August 9, 1971:

"(1) Whenever a person while under sentence of felony shall commit another felony and be sentenced to another term of imprisonment, such latter term shall not begin until the expiration of all prior terms: *Provided,* That any person

reviewed on appeal, our function is limited to determining whether the trial court abused its discretion. *State v. Harp,* 13 Wn. App. 239, 534 P.2d 842 (1975). Having considered the nature of the crime, the defendants' reasons for their actions and apparent lack of remorse, the trial court ordered the sentences to run consecutively. This is within its authority and we find no abuse of discretion.

Reversed and remanded for a new trial.

MUNSON and McINTURFF, JJ., concur.

Reconsideration denied September 5, 1979.

Review granted by Supreme Court December 7, 1979.

granted probation pursuant to the provisions of RCW 9.95.210 and/or 9.92.060 shall not be considered to be under sentence of a felony for the purposes of this subsection.

"(2) Whenever a person is convicted of two or more offenses which arise from a single act or omission, the sentences imposed therefor shall run concurrently, unless the court, in pronouncing sentence, expressly orders the service of said sentences to be consecutive.

"(3) In all other cases, whenever a person is convicted of two or more offenses arising from separate and distinct acts or omissions, and not otherwise governed by the provisions of subsections (1) and (2) of this section, the sentences imposed therefor shall run consecutively, unless the court, in pronouncing the second or other subsequent sentences, expressly orders concurrent service thereof.

"(4) The sentencing court may require the secretary of the department of social and health services, or his designee, to provide information to the court concerning the existence of all prior judgments against the defendant, the terms of imprisonment imposed, and the status thereof."